ORIGINAL

FILED
SEP 4 2007
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **HADDON HOUSING ASSOCIATES, LIMITED PARTNERSHIP**<br>1450 E. Chestnut Ave., Building 1, Suite C<br>Vineland, NJ 08361<br><br>and<br><br>**HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON**<br>Municipal Building<br>25 Wynnewood Avenue<br>Westmont, NJ 08109<br><br>Plaintiffs,<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | CASE NO.<br><br>07-646 C<br><br>**COMPLAINT** |

## I. Preliminary Statement

1. Plaintiffs Haddon Housing Associates, LLC, a New Jersey Limited Partnership ("Housing Associates") and the Housing Authority of the Township of Haddon, NJ, a public entity of the State of New Jersey ("Housing Authority"), bring this action for damages resulting from the failure of the United States of America, acting through the Department of Housing and Urban Development ("HUD"), to provide for automatic annual rent increases or appropriate such increases in the Contract anniversary years 2001 through 2007 for the Rohrer Towers II Apartments project. Under the Housing Assistance Payment Contract ("Rohrer Towers II HAP Contract") entered into between the Housing Authority and HUD, the Rohrer Towers II project is entitled to annual rent increases for the subject property more fully described herein. HUD has breached the Rohrer Towers II HAP Contract by its failure and subsequent refusal to grant the

rent increases, mandated by the Rohrer Towers II HAP Contract, resulting in damages to the Rohrer Towers II project in the amount of at least $955,800.

## II. Venue

2. This Court has subject matter jurisdiction pursuant to the provisions of the Tucker Act, 28 U.S.C. § 1491, as this claim is founded upon breaches of an express contract entered into between Housing Authority and HUD and in which Housing Associates has an interest.

## III. Parties

3. Housing Associates is a limited partnership duly organized and existing under the laws of the State of New Jersey and is the owner of a certain property known as the Rohrer Towers II Apartments which is located in Haddon Township, Camden County, New Jersey and consists of 100 one bedroom units and one bedroom manager's apartment.

4. Housing Associates leased the property for 30 years to Housing Authority pursuant to a Lease Agreement dated January 1, 1980. Housing Associates and its successors are obligated under the Lease to operate and maintain the property pursuant to the Rohrer Towers II HAP Contract and Housing Authority is obligated to assist in obtaining eligible tenants and to assign all income from the project, including that from the Rohrer Towers II HAP Contract, to Housing Associates and its successors. (See Lease Agreement between Housing Associates and Housing Authority attached as Exhibit A.)

5. HUD is an agency of the United States of America and at all times relevant to the allegations in this Complaint was acting as an agent of the United States of America. The actions of HUD are therefore imputed to the United States of America.

## IV. Statement of Operative Facts

### A. The Rohrer Towers II HAP Contract

6. As of March 17, 1981, Housing Authority entered into a HAP contract with HUD for Rohrer Towers II Apartments, designated the Rohrer Towers II Apartments Project, HUD project number NJ16-0029-003. (See Rohrer Towers II HAP Contract attached as Exhibit B.) Said Contract was authorized under the United States Housing Act of 1937, 42 U.S.C.1437, *et seq.*, specifically 42 U.S.C. 1437f ("Section 8"), and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, *et seq.*

7. Under the terms of the Rohrer Towers II HAP Contract, HUD is to provide housing assistance payments to Rohrer Towers II for units in the Rohrer Towers II Apartments Project under lease by lower-income families.

8. The Rohrer Towers II HAP Contract sets forth the initial contract rent for each unit at $493 per unit per month for one bedroom units ("Initial Contract Rent"). Included within that Initial Contract Rent was an initial difference of 20% between that rent and fair market rent for comparable unassisted units.

9. Under Section 2.4(h) of the Rohrer Towers II HAP Contract, the project owner is required to submit monthly requests to HUD for housing assistance payments.

10. Section 2.7(b) of the Rohrer Towers II HAP Contract, entitled Rent Adjustments, contains a mechanism whereby the Contract Rent due Rohrer Towers II is to be increased on an annual basis, based upon automatic annual adjustment factors ("AAF") published by HUD.

11. Since the Rohrer Towers II HAP Contract went into effect, HUD has published AAFs for each year.

12. Section 2.7(d) of the Rohrer Towers II HAP Contract further provides:

> (d) *<u>Overall Limitation</u>. Notwithstanding any other provisions of this Contract, adjustments after execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD; except to the extent that differences existed with respect to the Contract Rent set at Contract execution or cost certification, where applicable.*

13. Under the provisions of 42 U.S.C. § 1437f(c)(1), the housing assistance payments provided by HUD are designed to reimburse the project owner for the difference between the rent called for under the Rohrer Towers II HAP Contract for each unit ("Contract Rent") and the amount paid by each leasing family.

**B. The Amendments and the Directive**

14. On September 28, 1994, Congress enacted amendments to the United States Housing Act of 1937 including amendments to 42 USCA §1437f(c)(2)(A), which limited adjustment of rents under HAP Contracts to situations where the owner demonstrates that the adjustment would not exceed comparable rents for unassisted units and required the deduction of one percent from the AAF for units occupied by the same family ("Amendments").

15. After enactment of the Amendments, HUD issued Directive 95-12 ("Directive") to implement the Amendments.

16. If existing contract rents exceeded HUD published fair market rents for the area, in order to receive an adjustment of rent, the Directive required owners to submit comparability studies showing comparable rents at least five percent more than the existing rent. The Directive limited adjustments to the sum of comparable rent and the Initial Difference.

17. The Directive also provided for deduction of one percent from the AAF for units occupied by the same families and provided that adjustments in rent would only take effect 60 days from the date of application for same.

18. Because of its implementation of the Amendments and the Directive, HUD breached the Rohrer Towers II HAP Contract.

**Count I**

**(Breach of Contract - Annual Rent Adjustment)**

19. Plaintiffs re-allege the allegations contained in Paragraphs 1-18 of this Complaint as if fully rewritten herein.

20. Between 1980 and 1995 the Contract Rent for Rohrer Towers II was increased pursuant to the provisions of the Rohrer Towers II HAP Contract from $493 to $860 for one bedroom units. There were no increases granted since then for the anniversary years 1996 through 2006. For anniversary year 2007, the Contract Rent was increased to $889.00.

21. Since the 1995 Contract Rent adjustment which established the Contract Rent recited in paragraph 20 above, the Government has published AAFs each year.

22. Based upon the provisions of the Rohrer Towers II HAP Contract cited above, Plaintiffs were entitled to receive appropriate Contract Rent adjustments through application of the AAFs for the anniversary years 1996 through the date of the filing of this Complaint, which HUD, though requested, has failed to provide.

23. The failure by HUD to adjust appropriately the Contract Rents through application of the AAFs on the Rohrer Towers II HAP Contract's anniversary dates has resulted in substantially lower housing assistance payments being made by HUD to Plaintiffs for the Rohrer

Towers II Project since HUD's first failure to adjust fully the Contract Rent on March 17, 1995 and to pay the appropriate Contract Rent on March 17, 2001.

24. Despite Plaintiffs' compliance with the express provisions of the Rohrer Towers II HAP Contract, HUD continues to refuse to make retroactive rent adjustments for the anniversary years 2001 through the date of the filing of this Complaint.

25. By its actions, HUD has breached the express terms of the Rohrer Towers II HAP Contract in failing to pay fully the automatic annual adjustments in the Contract Rent for the anniversary years 2001 through the date of the filing of this Complaint.

26. As a result of HUD's breach of the Rohrer Towers II HAP Contract, Plaintiffs have been damaged in an amount not less than $955,800. Plaintiffs are therefore entitled to the monetary and other relief described hereinafter.

**Count II**

**(Breach of Contract - One Percent Reduction)**

27. Plaintiffs re-allege the allegations contained in Paragraphs 1-26 of this Complaint as if fully rewritten herein.

28. HUD further breached the Rohrer Towers II HAP Contract by providing that it would reduce the AAFs by one percent for units occupied by the same tenant for the anniversary years 1995 through the date of filing of this Complaint.

**Count III**

**(Declaratory Relief – One Percent Reduction)**

29. Plaintiffs re-allege the allegations contained in Paragraphs 1-28 of this Complaint as if rewritten herein.

30. The One Percent Reduction required by the Amendments and the Directive would result in a breach of the Rohrer Towers II HAP Contract, if applied, and Plaintiffs request a declaration to that effect and an order prohibiting application of such One Percent Reduction.

**Count IV**

**(Breach of Contract – Failure to Automatically Adjust Rent from 1995-2000)**

31. Plaintiffs re-allege the allegations contained in paragraphs 1-30 as if fully rewritten herein.

32. HUD further breached the Rohrer Towers II HAP Contract by failing to adjust fully the Contract Rent from 1995 through 2000 anniversary years so that the 2000 Contract Rent for the application of the 2001 AAF was lower than it should have been.

**Count V**

**(Breach of Contract - Overall Limitation-Initial Difference)**

33. Plaintiffs re-allege the allegations contained in Paragraphs 1-32 of this Complaint as if fully rewritten herein.

34. HUD further breached the Rohrer Towers II HAP Contract by failing to make a proper determination of and allowance for "initial difference".

**Count VI**

**(Breach of Contract - Overall Limitation-Material Difference)**

35. Plaintiffs re-allege the allegations contained in Paragraphs 1-34 of this Complaint as if fully rewritten herein.

36. HUD further breached the Rohrer Towers II HAP Contract by failing to make a proper determination of and allowance for "material difference".

## Count VII

**(Breach of Contract - Overall Limitation-Material Difference - Alternative)**

37. Plaintiffs re-allege the allegations contained in Paragraphs 1-36 of this Complaint as if fully rewritten herein.

38. In the alternative, if HUD had not breached the Rohrer Towers II HAP Contract as alleged in paragraph 36, it breached said contract by failing to apply the appropriate Overall Limitation of 120% of the sum of comparable rent and initial difference for the anniversary years 1995 through the date of filing of this Complaint.

## Count VIII

**(Breach of Contract - Comparability Studies and Time Limits)**

39. Plaintiffs re-allege the allegations contained in Paragraphs 1-38 of this Complaint as if fully rewritten herein.

40. HUD further breached the Rohrer Towers II HAP Contract by its application of the Directive's 60-day time limit and the requirement of Rohrer Towers II to obtain comparability studies in order to obtain annual rent adjustments for the years 2001 through the date of the filing of this Complaint.

WHEREFORE, Plaintiffs pray that this Court award it money damages in the amount of at least $955,800, all additional money damages suffered by Plaintiffs arising out of HUD's breach of the Rohrer Towers II HAP Contract, all other money damages suffered by Plaintiffs from the filing of the within Complaint until entry of judgment, such additional other amounts that are proved at trial, together with pre- and post-judgment interest, attorney fees and any such declaratory and other relief that the Court deems proper.

Respectfully submitted,

Dated: 8/31/07

Fred J. Livingstone (0009528)
Mark J. Valponi (0009527)
Majeed G. Makhlouf (0073853)
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

Attorneys for Plaintiffs

HADDON HOUSING ASSOCIATES, A LIMITED PARTNERSHIP

and

HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON

# LEASE AGREEMENT

DATED AS OF January 1, 1980

EXHIBIT

A

# TABLE OF CONTENTS

This Table of Contents is not a part of the Lease Agreement and is only for convenience of reference.


Parties ........................................ 1
Recitals ........................................ 1

ARTICLE I

DEFINITIONS AND CONSTRUCTION

SECTION 1.01. Definitions.............................. 2
SECTION 1.02. Construction............................. 4

ARTICLE II

REPRESENTATIONS

SECTION 2.01. Representations of the Issuer.............. 6
SECTION 2.02. Representations of the Lessee.............. 6

ARTICLE III

LEASE OF PROJECT AND RENTALS

SECTION 3.01. Lease of Project.......................... 7
SECTION 3.02. Term of Lease; Renewal Options; Purchase Option......................... 7
SECTION 3.03. Basic Rent................................ 7
SECTION 3.04. Pledge of Basic Rent and Additional Rent................................... 8
SECTION 3.05. Additional Security....................... 8
SECTION 3.06. Equipment................................. 8
SECTION 3.07. Annual Budgets............................ 8

ARTICLE IV

COVENANTS OF LESSOR AND LESSEE

SECTION 4.01. Operation of Project...................... 9
SECTION 4.02. Maintenance of Project.................... 9

SECTION 4.03. Additions, Modifications and Improvements... 9
SECTION 4.04. Insurance.................................. 9
SECTION 4.05. Liens...................................... 9
SECTION 4.06. Taxes and Other Governmental Charges........ 10
SECTION 4.07. Utility Charges............................ 10
SECTION 4.08. Project Occupancy.......................... 10
SECTION 4.09 Request for Housing Assistance Payments...... 10

ARTICLE V

DAMAGE, DESTRUCTION AND CONDEMNATION

SECTION 5.01. Damage or Destruction; Condemnation......... 12

ARTICLE VI

ASSIGNMENT OF LEASE; MORTGAGE OR PROJECT BY LESSOR; TERMINATION OF LEASE

SECTION 6.01. Assignment of Lease by Lessee............... 13
SECTION 6.02. Mortgage of Project by Lessor............... 13
SECTION 6.03. Termination of Lease; Reference to Bonds Ineffective After Bonds Paid.............. 13
SECTION 6.04. All Funds Held by the Trustee to be Paid to Lessee on Expiration of Lease.......... 13

ARTICLE VII

CONCERNING THE HAP AGREEMENT AND THE HAP CONTRACT

SECTION 7.01. Compliance With Terms and Provisions of HAP Agreement and HAP Contract................................... 15
SECTION 7.02. Exercise of Renewals........................ 15
SECTION 7.03. Adjustments Under HAP Contract.............. 15
SECTION 7.04. Modification or Amendment of HAP Agreement or HAP Contract................. 15

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

SECTION 8.01. Events of Default.............................. 16
SECTION 8.02. Remedies...................................... 16
SECTION 8.03. Disposition of Funds.......................... 17
SECTION 8.04. Manner of Exercise............................ 17
SECTION 8.05. Effect of Waiver.............................. 17
SECTION 8.06. Waiver of Stay or Extension Laws............ 18
SECTION 8.07. Trustee's Exercise of Lessor's Remedies..... 18

## ARTICLE IX

## MISCELLANEOUS

SECTION 9.01. Notices........................................ 19
SECTION 9.02. Binding Effect................................ 19
SECTION 9.03. Severability.................................. 19
SECTION 9.04. Executed Counterparts......................... 19
SECTION 9.05. Applicable Laws............................... 19
SECTION 9.06. No Recourse to Lessor......................... 20

THIS LEASE AGREEMENT, dated as of January 1, 1980, between HADDON HOUSING ASSOCIATES, a limited partnership organized and existing under the laws of the State of New Jersey (the "Lessor") and the HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON, a public body corporate and politic organized and existing under the laws of the State of New Jersey (the "Lessee");

WITNESSETH:

WHEREAS, the Lessor intends to construct and own a 100 Unit low income housing project for the elderly at Crystal Lake Avenue in the Township of Haddon, New Jersey (the "Project") with the intention of leasing the Project to the Lessee; and

WHEREAS, to finance the cost of acquiring and constructing the Project the Lessor will obtain financing on a temporary and permanent basis from the Haddon Township Housing Corporation (the "Corporation") which will issue $4,764,383 Construction Notes (the "Construction Notes") and $5,000,000 Section 8 Assisted Housing Revenue Bonds (the "Bonds"), respectively, for such purpose; and

WHEREAS, the Lessee has heretofore entered into an Agreement to Enter Into Housing Assistance Payments Contract ("HAP Agreement") with the United States of America acting through the Department of Housing and Urban Development ("HUD") pursuant to the provisions and requirements of Section 8 of the United States Housing Act of 1937, as amended and supplemented (the "Act"), which Agreement provides for the execution of a Housing Assistance Payments Contract ("HAP Contract") upon completion of the Project and its acceptance by HUD; and

WHEREAS, under the terms of the HAP Contract, HUD will pay to the Lessee housing assistance payments on behalf of Eligible Tenants occupying the Project; and

WHEREAS, the Lessor and the Lessee desire to enter into this Lease so as to enable the Lessee to execute the HAP Agreement with HUD and to sublet dwelling units in the Project to tenants consistent with the HAP Agreement;

NOW, THEREFORE, in consideration of the respective covenants and agreements on the part of the parties herein contained, the parties hereto respectively recite, represent, warrant, covenant and agree as follows:

# ARTICLE I.

## DEFINITIONS AND CONSTRUCTION.

SECTION 1.01. Definitions. In addition to words and terms elsewhere defined in this Lease, the following words and terms as used in this Lease shall have the following meanings, unless some other meaning is plainly intended.

"Act" means the United States Housing Act of 1937, as amended and supplemented;

"Basic Rent" means the rent payable under Section 3.03 herein;

"Bonds" means the Housing Revenue Bonds of the Issuer, issued pursuant to the Indenture to permanently finance the Project;

"Construction Lender" means First Peoples Bank of New Jersey;

"Construction Loan Agreement" means the agreement among the Corporation, the Company and the Construction Lender, dated as of January 1, 1980, relative to the interim financing of the Cost of Construction, (as defined in the Indenture) of the Project;

"Construction Notes" means the Notes of the Issuer issued pursuant to the Construction Loan Agreement to provide the construction financing for the Project;

"Corporation" means the Haddon Township Housing Corporation;

"Counsel" means an attorney designated by or acceptable to the Trustee, duly admitted to practice law before the highest court of the State of New Jersey;

"Credit Agreement" means the agreement between the Issuer, the Trustee and the Lessor dated as of December 1, 1979, regarding the permanent financing of the Project by the Issuer;

"Current Expenses" means expenses incurred or to be incurred by the Lessee in the operation and maintenance of the Project determined on a cash basis, but shall exclude Basic Rent and Additional Rent;

"Eligible Tenants" means persons of lower income or other families who qualify for housing assistance under Section 8 of the Act and the rules and regulations promulgated thereunder from time to time;

"Equipment" means the furnishings, equipment and appliances and any other furnishings, equipment and appliances substituted therefor located at the Project;

"Event of Default" means any event set forth in section 8.01 of the Lease;

"Extraordinary Maintenance" means extraordinary maintenance, repair and replacement which may be required at the Project during the term of this Lease, including but not limited to, replacement of equipment, repair or replacement of any roof or other structural component of the Facility, exterior painting and major repairs to or replacement of heating, air conditioning, plumbing and electrical systems;

"Facility" means the housing facility consisting of 100 dwelling units located wholly within the boundaries of the Project Site, including incidental space, facilities and rights of ingress and egress;

"Fiscal Year" means the calendar year;

"Government" means the United States of America, acting through the Department of Housing and Urban Development, or its successor;

"HAP Agreement" means the Agreement to Enter Into a Housing Assistance Payments Contract, as may be amended, by and between HUD and the Lessee;

"HAP Contract" means the agreement to be entered into by HUD and Lessee upon completion and acceptance of the Project by HUD in accordance with Section 8 of the United States Housing Act of 1937, as amended and the regulations promulgated thereunder by which Housing Assistance Payments are made on behalf of Eligible Tenants;

"HAP Payments" means the amounts payable by HUD on behalf of Eligible Tenants under the HAP Contract;

"Housing Revenue Bonds" means the Bonds hereinbefore described;

"HUD" means the United States Department of Housing and Urban Development its successors and assigns;

"Indenture" means the Indenture of Trust dated as of January 1, 1980 by and between the Issuer and the Trustee;

"Issuer" means the Haddon Township Housing Corporation and its successors and assigns;

"Lease" or "Lease Agreement" means this Lease Agreement as it now exists or as it may be amended or supplemented;

"Lease Payments" means all sums payable to the Lessor pursuant to the Lease;

"Lessee" means the Housing Authority of the Township of Haddon, New Jersey, and its successors and assigns;

"Lessor" means Haddon Housing Associates, a New Jersey limited partnership;

"Mandatory Sinking Fund Installments" means the mandatory sinking fund installments as defined by the Indenture;

"Plans and Specifications" means the drawings and specifications for the Project heretofore approved by the Lessee and HUD and identified in the Indenture;

"Project" means the Project Site, the Facility and the Equipment as they may at any time exist, and all other property and rights of every kind leased or intended to be leased hereunder;

"Project Site" means the real property located at Crystal Lake Avenue, in the Township of Haddon, New Jersey, on which the Project is located;

"State" means the State of New Jersey;

"Trustee" means the Trustee and its successor or any co-trustee under the Indenture.

SECTION 1.02. Construction. Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Words importing the singular number shall include the plural number and vice versa

unless the context shall otherwise indicate. The word "person" shall include corporations, associations, natural persons and public bodies unless the context shall otherwise indicate.

ARTICLE II.

REPRESENTATIONS.

SECTION 2.01. Representations of the Lessor. The Lessor makes the following representations as the basis for the undertakings on its part herein contained:

(a) The Lessor is a limited partnership organized and existing under the laws of the State;

(b) The Lessor will acquire title to the Project Site and construct the Project thereon;

(c) The Lessor has the power to enter into the transactions contemplated by this Lease and to carry out its obligations hereunder and by proper corporate action the Lessor has been duly authorized to execute and deliver this Lease;

(d) The Lessor has entered into a Construction Loan Agreement and a Credit Agreement with the Issuer in order to obtain the construction and permanent financing for the acquisition and construction of the Project.

SECTION 2.02. Representation of the Lessee. The Lessee makes the following representations as the basis for the undertakings on its part herein contained:

(a) The Lessee is a public body corporate and politic organized and validly existing under the laws of the State;

(b) The Lessee has the power to enter into the transactions contemplated by this Lease and to carry out its obligations hereunder and by proper official action has been duly authorized to execute and deliver this Lease;

(c) The Lessee has entered into the HAP Agreement with HUD providing for the payment, upon completion of the Project satisfactorily to HUD and execution of the HAP Contract, of HAP Payments with respect to units in the Project for the benefit of Eligible Tenants upon the terms and conditions stated therein.

ARTICLE III.

LEASE OF PROJECT AND RENTALS.

SECTION 3.01. Lease of Project. The Lessor does hereby lease and devise the Project to the Lessee, and the Lessee does hereby lease and rent the Project from the Lessor, for and during the term herein specified.

SECTION 3.02. Term of Lease; Renewal Options; Purchase Option. The term of this Lease shall, except as otherwise provided, be the shorter of thirty (30) years, or such other time as Bonds remain outstanding pursuant to the Indenture, to commence upon the effective date of the HAP Contract, and, except as provided in Sections 5.01 and 6.03 hereof, to terminate on the termination date of the HAP Contract. Lessee agrees that the HAP Contract shall be executed by itself and HUD immediately upon completion of the Project and acceptance of the Project by HUD as provided in the Indenture and that the HAP Contract shall be effective as of the completion date as defined in the Indenture. Notwithstanding any of the foregoing, Lessee shall have an option to renew the Lease under like terms for successive five (5) year periods in the aggregate not to exceed twenty (20) years. The option for each period must be exercised in writing by notice to the Lessor at least three (3) months before the end of the term under which the Project is then being leased. At the end of the initial 30 year term of the Lease or at any time during the succeeding terms of the Lease, Lessee may purchase the Project at its then fair market value, to be determined by HUD.

SECTION 3.03. Basic Rent. The Lessee agrees to pay to the Lessor as Basic Rent for the Project as and when received, but in any event at least five (5) days prior to the first day of each month during the term of this Lease an amount equal to the sum of all income received from or in connection with the operation of the Project, including but not limited to HAP Payments, tenant rentals and other revenues generated from the Project. The Lessee, in order to meet its obligation under the HAP Contract, reserves the right upon a written determination of either HUD or the Trustee that the Lessor has failed to maintain and operate the Project in accordance with the HAP Contract or has taken actions or failed to have taken actions which will result in the Project not being maintained and operated in accordance with the HAP Contract, to withhold that amount of Basic Rent necessary for operation and maintenance expenses of the project, if in the opinion of the Trustee the Lessor is not maintaining and operating the Project consistent with the requirements of the HAP Contract. Such

amounts shall continue to be withheld until such time as evidence is supplied to HUD or the Trustee, as the case may be, by the Lessor that it is willing and able to operate and maintain the Project consistent with the requirements imposed on the Lessee pursuant to the HAP Contract. The Trustee, during such time, shall apply such withheld amount directly to the payment of operation and maintenance expenses on behalf of the Lessor.

SECTION 3.04. Pledge of Basic Rent. All Basic Rent properly paid and payable hereunder is hereby pledged to the extent not otherwise encumbered by the Lessor to the Trustee on behalf of the Issuer as security for the loan of the Issuer issued pursuant to the Credit Agreement and Indenture to finance the Project. The Lessee and the Lessor will join in the preparation of any documents or the filing of any financing statements in connection with this assignment and pledge. The obligation of the Lessee to pay Basic Rent is a special obligation of Lessee payable solely from funds received from tenants of the Project or from HUD pursuant to the HAP Contract.

SECTION 3.05. Additional Security. As further security for its obligations under this Lease Agreement, Lessee hereby assigns to the Trustee on behalf of the Issuer all right, title and interest in all moneys and claims described in the Assignment attached hereto as Exhibit A and hereby incorporated by reference as if set forth at length.

SECTION 3.06. Equipment. Lessor agrees to equip the Project as provided in the Plans and Specifications submitted to HUD by Lessee.

SECTION 3.07. Annual Budgets. Prior to the beginning of each Fiscal Year the Management Agent shall prepare or cause to be prepared on behalf of the Lessee a budget of anticipated revenues and expenses for each Fiscal Year and submit it to the Lessor and the Trustee for their approval.

ARTICLE IV.

COVENANTS OF LESSOR AND LESSEE.

SECTION 4.01. Operation of Project. The Lessor will operate the Project so that Lessee may comply with all rules and regulations of HUD which are or which may become applicable to the Project. The Lessee agrees to use its best efforts to keep all of the dwelling units occupied by Eligible Tenants so as to assure that there is no reduction in the amount of Housing Assistance Payments payable to the Lessee by HUD by reason of the lack of occupancy to the Project.

SECTION 4.02. Maintenace of Project. The Lessor will maintain or cause to be maintained each dwelling unit constituting a part of the Project in decent, safe and sanitary condition. Lessor shall be responsible for all ordinary and Extraordinary Maintenance in connection with the Project. All costs, expenses and fees shall be paid by or on behalf of the Lessor whether or not revenues received are adequate therefor.

SECTION 4.03. Additions, Modifications and Improvements. The Lessor may from time to time, with the approval of HUD, at its own expense, make any additions, modifications or improvements to the Project, located wholly within the boundary lines of the Project Site, that do not adversely affect the structural integrity or value of the Facility. All additions, modifications and improvements made by the Lessor shall become a part of the Project and shall be deemed to be leased to the Lessee.

SECTION 4.04. Insurance. The Lessor hereby covenants and agrees to maintain or cause to be maintained all policies of insurance provided in the Credit Agreement and naming the Lessee, the Issuer and the Trustee as additional insureds.

SECTION 4.05. Liens. Neither the Lessor nor the Lessee will permit any mechanics' or other liens to be filed or established or to remain against the Project for labor or materials furnished in connection with any repairs, renewals, replacements, additions, modifications or improvements, provided that if the Lessor or Lessee shall first notify the Trustee, it may in good faith contest any mechanics' or other lien filed or established and in such event may permit the items contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom unless the Trustee shall

notify the Lessor or Lessee that, in the opinion of Counsel, by nonpayment of any such items the lien of the Indenture as to any part of the Project will be materially endangered or the Project or any part thereof will be subject to loss or forfeiture, in which event the Lessor or Lessee, as the case may be, shall promptly pay all such unpaid items and cause them to be satisfied and discharged, provided that the Lessor or Lessee, as the case may be, shall undertake to apply all costs and expenses incurred by the Issuer and indemnify the Issuer and save it harmless against any risks, claims or liabilities arising out of such contest.

SECTION 4.06. Taxes and Other Governmental Charges. The Lessor will pay, as the same respectively become due, all taxes and payments in lieu of taxes that may be assessed or levied against or payable with respect to the Project. The Lessor may at its own expense, in good faith contest any such taxes or payments in lieu of taxes and in the event of such contest, may permit the items so contested to remain unpaid during the period of the contest and any appeal therefrom, unless the Trustee shall notify the Lessor that, in the opinion of Counsel, by nonpayment of any such items the lien of the Indenture as to any part of the Project will be materially endangered or the Project or any part thereof will be subject to loss or forfeiture, in which event such taxes, assessments or payments in lieu thereof shall be promptly paid.

SECTION 4.07. Utility Charges. The Lessor hereby agrees to pay or cause to be paid all utility charges relating to the operation of the Project.

SECTION 4.08. Project Occupancy. The Lessee covenants, in order to assure to the maximum extent possible that the 100 dwelling units of the Project will be fully and continually occupied, that subject to applicable laws and regulations it will use its best efforts to aid and assist the Management Agent in subleasing the units to Eligible Tenants and will make known any vacancies in the Project to tenants who are tenants in other dwelling units owned and/or managed by the Lessee. The Management Agent shall be selected by the Lessor with the approval of Lessee such consent not to be unreasonably withheld. Tenant selection shall be in accordance with the Management Contract. The Management Contract shall be executed by the Lessor, the Lessee and the Management Agent.

SECTION 4.09. Request for Housing Assistance Payments. On or before the tenth day of each month during the term of the HAP Contract and any renewals thereof, the Lessee or the Management Agent on the Lessee's behalf shall submit to HUD monthly

requests for the payment of Housing Assistance Payments for the next succeeding month with respect to the Project together with a specific direction to HUD that such payments shall be made to the Trustee. The Trustee shall deposit such payments into the Revenue Fund established under the Indenture and disburse them pursuant to the Indenture. Such deposits shall be credited to the Lessor against its obligations under the Note and Mortgage referred to in the Credit Agreement or shall otherwise be expended on behalf of Lessor.

ARTICLE V.

DAMAGE, DESTRUCTION AND CONDEMNATION.

SECTION 5.01. Damage or Destruction; Condemnation.

(a) In the event of the damage to or the destruction of the Project, or any part thereof, the Lessee will give immediate notice to the Lessor, the Issuer and the Trustee who may make proof of loss to any insurer and each insurer is hereby authorized and directed to make payment for such loss directly to the Trustee for application pursuant to the terms of the Indenture and Credit Agreement.

(b) In the event that the Project or any part thereof is condemned by any power of eminent domain, the condemnation award for such taking is hereby assigned to the Trustee for application pursuant to the terms of the Indenture and Credit Agreement.

ARTICLE VI.

ASSIGNMENT OF LEASE; MORTGAGE OF PROJECT BY LESSOR; TERMINATION OF LEASE

SECTION 6.01. Assignment of Lease by Lessee. The Lessee may assign this Lease and the leasehold interest created hereby only with the consent of the Lessor, the Trustee and HUD. No assignee or anyone claiming under any such assignment shall acquire any greater rights in the Project or in any part thereof than the Lessee, and no such assignment shall relieve the Lessee from primary liability for any obligations hereunder. In the event of any such assignment, the Lessee shall continue to remain primarily liable for payment of the rental and other obligations hereunder, and for performance and observance of the other agreements and covenants to be performed and observed by the Lessee hereunder.

SECTION 6.02. Mortgage of Project by Lessor. Pursuant to the Credit Agreement the Lessor will mortgage the Project to the Issuer who in turn will assign its interest to the Trustee as security for payment of the principal of and the interest on the Bonds. The Trustee shall have all rights and remedies herein accorded the Lessor and any reference herein to the Lessor shall be deemed to include the Trustee, and the Trustee and the holders of the Bonds shall be deemed to be third party beneficiaries of the covenants and agreements of the Lessee contained herein. Prior to payment in full of the principal of and interest on the Bonds, the Lessor and the Lessee shall not modify, alter, amend or (except as specifically authorized herein) terminate this Lease without the prior written consent of the Trustee and HUD and then only as provided in the Indenture, and the Lessor shall not consent to any amendment to the Indenture or authorize any indenture supplemental thereto without the prior written consent of the Lessee.

SECTION 6.03. Termination of Lease; References to Bonds Ineffective After Bonds Paid. At the option of either the Lessor or the Lessee upon full payment of all of the Bonds in original or refunded form, and payment or provision for payment of all other charges due or accrued pursuant to this Lease, this Lease shall terminate and all references in this Lease to the Bonds and the Trustee shall be ineffective and neither the Trustee nor the holders of any of the Bonds shall thereafter have any rights hereunder.

SECTION 6.04. All Funds Held by the Trustee to be Paid to the Lessor on Expiration of the Lease. Upon the termination

of this Lease either by expiration of the term hereof or in accordance with Section 6.03 hereof, all money not otherwise payable to the Issuer then on deposit in any of the funds created in the Indenture to the extent not payable to HUD or the Corporation or the Bondholders, as provided herein, shall be the exclusive property of the Lessor.

## ARTICLE VII.

## CONCERNING THE HAP AGREEMENT AND THE HAP CONTRACT.

SECTION 7.01. Compliance With Terms and Provisions of HAP Agreement and HAP Contract. The Lessee covenants to comply with the terms and provisions of the HAP Agreement and the HAP Contract.

SECTION 7.02. Exercise of Renewals. The Lessee agrees to exercise renewal terms under the HAP Contract to the extent necessary to keep the HAP Contract in force and effect while any Bonds are outstanding.

SECTION 7.03. Adjustments Under HAP Contract. The Lessee or the Management Agent, on the Lessee's behalf hereby covenants to apply to HUD for "Special Additional Adjustment of Contract Rents" under the HAP Contract to the extent that the Lessee or Lessor incurs increases in actual and necessary expenses of operating and maintaining the Project and is entitled to such adjustments.

SECTION 7.04. Modification or Amendment of HAP Agreement or HAP Contract. The Lessee agrees that it shall not consent to any modification or amendment of the HAP Agreement or the HAP Contract without the prior written approval of the Lessor and the Trustee, and the Trustee shall not approve any such modification or amendment unless such modification or amendment shall not, in the judgment of the Trustee, impair the security for the Bonds.

ARTICLE VIII.

EVENTS OF DEFAULT AND REMEDIES.

SECTION 8.01. Events of Default. Any one or more of the following events is an Event of Default under this Lease:

(a) failure of the Lessee to pay the rental specified in Sections 3.03 and 3.04 hereof on or before the date payment is due;

(b) failure of the Lessee to observe and perform any other covenant, condition or agreement on its part under this Lease for a period of thirty (30) days after written notice, specifying such default and requesting that it be remedied, given to the Lessee;

(c) if the Lessee shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to any present or future federal bankruptcy act or under any similar federal or state law, or shall make an assignment for the benefit of its creditors or shall admit in writing its inability to pay its debts generally as they become due, or if a petition or answer proposing the adjudication of the Lessee as a bankrupt or its reorganization under any present or future federal bankruptcy act or any similar federal or state law shall be filed in court and such petition or answer shall not be discharged or denied within sixty (60) days after the filing thereof, or a receiver, trustee or liquidator of the Lessee or of all or substantially all of the assets of the Lessee or of the Project shall be appointed in any proceeding brought against the Lessee and shall not be discharged within sixty (60) days after such appointment or if the Lessee shall consent to or acquiese in such apppointment, or of the estate or interest of the Lessee in the Project or any part thereof shall be levied upon or attached in any proceeding and such process shall not be vacated or discharged within ten (10) days after such levy or attachment, of the Lessee shall be dissolved or liquidated;

(d) failure of the Lessee to meet its obligations under the HAP Contract.

SECTION 8.02. Remedies. Whenever any Event of Default referred to in Section 8.01 shall have happened and be continuing any one or more of the following remedies may be exercised by the Lessor with the prior consent of the Trustee:

(a) The Lessor may re-enter and take possession of the Project without termination of this Lease, and use its best efforts to lease the Project for the account of the Lessee holding the Lessee liable for the difference in the rent and other amounts payable by any lessee and the rents and other amounts payable by the Lessor hereunder;

(b) the Lessor with the permission of HUD may terminate the term of this Lease, exclude the Lessee from possession of the Project, and use its best efforts to lease the Project for the account of the Lessor;

(c) the Lessor may require the Lessee to furnish copies of all books and records of the Lessee pertaining to the Project; and/or

(d) the Lessor may take whatever action at law or in equity may appear necessary or appropriate to collect the Basic Rent and the Additional Rent then due and therafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Lessee under this Lease.

SECTION 8.03. <u>Disposition of Funds</u>. Any amounts collected pursuant to action taken under Section 8.02 shall be paid to the Trustee and applied in accordance with the provisions of the Indenture.

SECTION 8.04. <u>Manner of Exercise</u>. No remedy herein conferred upon to the Lessor is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Lease or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Lessor to exercise any remedy reserved to it in this Article VIII, it shall not be necessary to give any notice other than such notice as may be herein expressly required.

SECTION 8.05. <u>Effect of Waiver</u>. In the event any agreement contained in this Lease should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach.

SECTION 8.06. Waiver of Stay or Extension Laws. To the extent permitted by law, the Lessee covenants not to plead, or in any manner claim the advantage of, any stay or extension law, now or at any time hereafter in force, which may affect the covenants or the performance of this Lease or the Indenture, and to the extent permitted by law, the Lessee hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Lessor or the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 8.07. Trustee's Exercise of the Lessor's Remedies. Whenever any Event of Default shall have happened and is continuing under the Indenture the Trustee may exercise any of the remedies of the Lessor under this Article VIII.

ARTICLE IX.

MISCELLANEOUS.

SECTION 9.01. Notices. All notices, certificates or other communications hereunder shall be sufficiently given and shall be deemed given when mailed by certified or registered mail, postage prepaid, with proper address, as indicated below. The Lessor, the Lessee and the Trustee may, by written notice given by each to the others, designate any address or addresses to which notices, certificates or other communications to them shall be sent when required as contemplated by this Lease. Until otherwise provided by the respective parties, all notices, certificates and communications to each of them shall be addressed as follows:

To the Lessor: 35 Kings Highway, c/o Kulzer & Di Padova, Haddonfield, New Jersey

To the Lessee: Wynnwood Avenue, Haddon Township, New Jersey
Attention: Executive Director

The the Trustee: Cuthbert Blvd., Haddon Township, New Jersey
Attention: Trust Department

To HUD: Gateway One, Newark, New Jersey
Attention: Legal Department

SECTION 9.02. Binding Effect. This Lease shall inure to the benefit of and shall be binding upon the Lessor and the Lessee and their respective successors and assigns.

SECTION 9.03. Severability. In the event any provision of this Lease shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision thereof.

SECTION 9.04. Executed Counterparts. This Lease may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

SECTION 9.05. Applicable Laws. This Lease shall be governed exclusively by the provisions hereof and by the applicable laws of the State or where appropriate the laws of the United States.

SECTION 9.06 No Recourse to Lessor. No recourse shall be had for any claim based on any provision of this Lease Agreement against any member, officer or employee, past, present or future, of the Lessor, or any of its general or limited partners, or of any successor bodies as such, either directly or through the Lessor or any such successor bodies, under any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise.

IN WITNESS WHEREOF, the Lessor by General Partner and the Lessee have caused this Lease to be executed in their respective names and the Lessee's corporate seal to be hereunto affixed and attested all as of the day first above written.

HADDON HOUSING ASSOCIATES

By: D'Anastasio Corp., General Partner

[SEAL]

By ______________________
John D'Anastasio
President

ATTEST:

______________________
John D'Anastasio
Secretary

HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON

By ______________________
Joseph S. Van Nort,
Vice President

ATTEST:

______________________
Francis J. Stagliano, Secretary

[SEAL]

ASSIGNMENT, OF HOUSING
ASSISTANCE PAYMENTS,
CONTRACT AND LEASES

---

HOUSING AUTHORITY OF THE TOWNSHIP
OF HADDON,

TO

HADDON HOUSING ASSOCIATES, LTD.

Premises: Haddon Township, New Jersey

---

DATED AS OF: January 1, 1980

---

RECORD & RETURN

Edward J. McManimon III, Esq.
Kraft & Hughes
Gateway I
Newark, New Jersey 07102

(201) 622-5656

EXHIBIT A

ASSIGNMENT OF HOUSING ASSISTANCE PAYMENTS
CONTRACT, LEASES AND OTHER REVENUES

THIS ASSIGNMENT made as of the 1st day of January, 1980, by THE HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON, a public body corporate and politic organized and existing under the laws of the State of New Jersey, with offices at Wynnwood Avenue, Haddon Township, New Jersey, hereafter referred to as the Assignor, (which term as here and hereinafter used shall be construed to include the plural thereof if the context so requires) to HADDON HOUSING ASSOCIATES (hereinafter referred to as the "Assignee"), Lessor under a Lease Agreement (hereinafter "Lease Agreement") with Assignor

WITNESSETH:

THAT the Assignor for good and valuable consideration, receipt whereof is hereby acknowledged, and as additional security for its obligation under a Lease Agreement with Assignee regarding 100 units of low income housing located at Crystal Lake Avenue, Haddon Township, New Jersey and more particularly described on Schedule A attached hereto (the "Project") hereby grants, transfers and assigns to the Assignee the entire Assignor's interest in and to (a) a Housing Assistance Payments Contract (the "Contract") between it and the United States Department of Housing and Urban Development ("HUD") to be executed upon completion of the Project hereinafter described; (b) all leases of the units constituting the Project; and (c) any and all other rights and claims payable to the Assignor from any source in connection with the operation and maintenance of the Project;

TOGETHER with all rents, income and profits arising from said Contract and leases and renewals thereof and together with all rents, income and profits for the use and occupation of the premises described in said Lease Agreement and, from all leases upon said premises which may be executed in the future during the term of this Assignment.

THIS ASSIGNMENT is made for the purpose of securing:

A. The payment of the lease obligation of Assignor in connection with the use of the Project provided for in the Lease Agreement between Assignor and Assignee.

B. Payment of all other sums with interest thereon becoming due and payable to the assignee under the provisions of this assignment or of said Lease Agreement.

C. The performance and discharge of each and every obligation, covenant and agreement of the assignor contained herein or in said Lease Agreement.

THE ASSIGNOR COVENANTS with the assignee to observe and perform all the obligations imposed upon it under said contract and leases and not to do or permit to be done anything to impair the security thereof; not to collect any of the rent, income and profits arising or accruing under said Lease Agreement in advance of the time when the same shall become due; not to execute any other assignment of lessor's interest in said Contract or leases or assignment of rents or other payments arising or accruing from said Contract or leases or from the premises described in the mortgages; not to subordinate said contract or leases to any mortgage or other encumbrance or permit, consent or agree to such subordination without assignee's prior written consent; not to alter, modify or change the terms of said Contract or leases or give any consent or exercise any option required or permitted by such terms without the prior written consent of assignee, or cancel or terminate said Contract or leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the premises demised thereby or of any interest therein so as to effect directly or indirectly, proximately or remotely a merger of the estates and rights of, or a termination or diminution of the obligations of, lessee under any lease; and to execute and deliver at the request of the assignee all such further assurances and assignments in the premises as the assignee shall from time to time require.

THIS ASSIGNMENT is made on the following terms, covenants and conditions:

1. Assignor agrees that all Housing Assistance Payments, properly paid or payable, together with all other rents, incomes and profits arising from the HAP Contract and the leases and any renewals thereof and all rents, incomes and profits for the use and occupation of the Project shall be directly paid and payable to the Trustee on behalf of Assignee; said sums shall be held in escrow by the Trustee and to the extent required deposited by the Trustee into the Revenue Fund, established by the Indenture, in an amount sufficient to satisfy the Assignor's obligations under the Lease Agreement, and the documents executed in connection therewith.

2. Upon or at any time after default in the payment of the lease obligation contained in the Lease Agreement or in the performance of any obligation, covenant or agreement herein or in said Lease Agreement or said Contract or leases contained on the part of the assignor to be performed, the assignee without in any way waiving such default may at its option without notice and without regard to the adequacy of the security for the said lease obligation contained in the Lease Agreement secured hereby and by said Lease Agreement either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the premises described in said leases and have, hold, manage, lease and operate the same on such terms and for such period of time as the assignee may deem proper and either with or without taking possession of said premises in its own name, demand, sue for or otherwise collect and receive all rents, income, payments and profits of said premises, including those past due and unpaid with full power to make from time to time all alterations, renovation, repairs or replacements thereto or thereof as may seem proper to the assignee and to apply such rents, income and profits to the payment of: (a) all expenses of managing the premises, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees as the assignee may deem necessary or desirable and all expenses of operating and maintaining the premises, including, without being limited thereto, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for all insurance which the assignee may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the premises; and (b) the lease obligation contained in the Lease Agreement secured hereby and by said Lease Agreement, together with all costs and attorneys' fees, in such order of priority as to any of the items mentioned in this paragraph numbered "2" as the assignee in its sole discretion may determine, any statute, law, custom or use to the contrary notwithstanding. The exercise by the assignee of the option granted it in this paragraph numbered "2" and the collection of the rents, income, payments and profits and the application thereof as herein provided shall not be considered a waiver of any default by the assignor under said Lease Agreement or under said leases or this assignment.

3. The assignee shall not be liable for any loss sustained by the assignor resulting from the assignee's failure to let the premises after default or from any other act or omission of the assignee in managing the premises after default unless such loss is caused by the willful misconduct and bad faith of the assignee. Nor shall the assignee be obligated to perform or discharge nor does the assignee hereby undertake to perform or discharge any obligation, duty or liability under said leases or under or by reason of this assignment and the assignor shall, and does hereby agree, to indemnify the assignee for, and to hold the assignee harmless from, any and all liability, loss or damage which may or might be incurred under said Contract, or any leases or under or by reason of this assignment and from any and all claims and demands whatsoever which may be asserted against the assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in said Contract or any leases. Should the assignee incur any such liability under said Contract, or any leases or under or by reason of this assignment or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees shall be secured hereby and the assignor shall reimburse the assignee therefor immediately upon demand and upon the failure of the assignor so to do the assignee may, at its option, declare all sums secured hereby and by said Lease Agreement immediately due and payable. And it is further understood that this assignment shall not operate to place responsibility for the control, care, management or repair of said premises upon the assignee, nor for the carrying out of any of the terms and conditions of or any leases; nor shall it operate to make the assignee responsible or liable for any waste committed on the property by the tenants or any other parties, or for any dangerous or defective condition of the premises, or for any negligence in the management, upkeep, repair or control of said premises resulting in loss or injury or death to any tenant, licensee, employee or stranger.

4. Upon payment in full of the lease obligation contained on the Lease Agreement secured hereby and by said Lease Agreement this assignment shall become and be void and of no effect but the affidavit, certificate, letter or statement of any officer, agent or attorney of the assignee showing any part of said lease obligation contained on the Lease Agreement to remain unpaid shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this assignment and any person may, and is hereby authorized to, rely thereon. The assignor hereby authorizes and directs HUD, or any lessee or occupant of the premises described therein or in said

mortgage upon receipt from the assignee of written notice to the effect that the assignee is then the holder of said Lease Agreement and that a default exists thereunder or under the assignment to pay over to the assignee all rents, income, payments and profits arising or accruing under said Contract or leases or from the premises described therein and to continue so to do until otherwise notified by the assignee.

5. The assignee may take or release other security for the payment of said lease obligation contained on the Lease Agreement, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the satisfaction of such lease obligation contained on the Lease Agreement without prejudice to any of its rights under this assignment.

6. The term "lease" or "said lease" as used herein means any lease executed during the term of this assignment covering the premises described in the Lease Agreement or any part thereof.

7. Nothing contained in this assignment and no act done or omitted by the assignee pursuant to the powers and rights granted it hereunder shall be deemed to be a waiver by the assignee of its rights and remedies under said Lease Agreement and this assignment is made and accepted without prejudice to any of the rights and remedies possessed by the assignee under the terms of said Lease Agreement. The right of the assignee to collect said principal sum, interest and indebtedness and to enforce any other security therefor held by it may be exercised by the assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

8. In case of any conflict between the terms of this instrument and the terms of the Lease Agreement described above, the terms of the Lease Agreement shall prevail.

9. This Assignment is the Collateral Assignment of the HAP Contract, the leases and other Revenues referred to in the Lease Agreement and is subject to all the terms and conditions contained in said Lease Agreement, to the same extent and effect as if fully set forth herein. Such Lease Agreement is available for inspection at all reasonable times at the offices of First Peoples Bank of New Jersey, Cuthbert Avenue, Haddon Township, New Jersey.

10. Assignment hereof shall become absolute upon termination of the Lease Agreement.

THIS ASSIGNMENT, together with the covenants and warranties therein contained, shall inure to the benefit of the assignee and any subsequent holder of the said Lease Agreement

and shall be binding upon the assignor, his heirs, executors, administrators, successors and assigns and any subsequent owner of the leased premises.

IN WITNESS WHEREOF, the assignors have hereunto set their hands and seals and caused these presents to be signed and delivered the day and year first above written.

ATTEST:

[SEAL]

HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON

Francis J. Stagliano
Secretary

By Joseph S. Van Nort
Joseph S. Van Nort
Vice-Chairman

ACKNOWLEDGMENT

STATE OF NEW JERSEY :
: SS
COUNTY OF CAMDEN :

BE IT REMEMBERED, that on this 23rd day of January, 1980, before me, the subscriber, an Attorney-at-Law of New Jersey, and I hereby certify that I am such an Attorney-at-Law as witness my hand, personally appeared Joseph S. Van Nort of the Housing Authority of the Township of Haddon who, I am satisfied is the person who executed the foregoing Instrument on behalf of said corporation, and who thereupon acknowledged that he signed, sealed with the corporate seal, and delivered said Instrument as such officer, and that said Instrument is the voluntary act and deed of said corporation, made by virtue of authority from its Board of Trustees.

Timothy R. Curtin
Attorney-at-Law of New Jersey

Prepared by:

Edward J. McManimon, III, Esq.
Kraft & Hughes
Gateway I, Suite 100
Newark, NJ 07102

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM

RECEIVED SEP 1 0 1989

PART I OF THE

HOUSING ASSISTANCE PAYMENTS CONTRACT

7 MAR '81 18 AM '81

Type of Project: Private-Owner/HUD ____ or PHA-Owner/HUD X
Small Project ____ or Partially-Assisted Project ____ or Other X
New Construction, Part 880 X or Substantial Rehabilitation, Part 881 ____
Part 885 ____ Part 885 ____

Type of Financing: 11(b) Financing; Not HUD Insured

[For example: subject to Part 811, HUD-insured; GNMA tandem; State agency tax exempt loan, not HUD-insured.]

ACC/HAP CONTRACT LIST NUMBER AND DATE: NY-80-088 January 18, 1980

SECTION 8 PROJECT NUMBER: NJ16-0029-003

FHA PROJECT NUMBER (if applicable): N/A

This Housing Assistance Payments Contract (Contract) is entered into between the United States of America acting through the Department of Housing and Urban Development (HUD) and HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON (Owner), pursuant to the U.S. Housing Act of 1937 (Act), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families leasing decent, safe and sanitary units from the Owner.

1.1 SIGNIFICANT DATES AND OTHER ITEMS: CONTENTS AND SCOPE OF CONTRACT.

(a) Effective Date of Contract: March 17, 19 81.

(b) Fiscal Year. The ending date of each Fiscal Year shall be ____________. [Insert March 31, June 30, September 30, or December 31, as approved by HUD.] The Fiscal Year for the project shall be the 12-month period ending on this date. However, the first Fiscal Year for the project is the period beginning with the effective date of the Contract and ending on the last day of the Fiscal Year which is not less than 12 months after the effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual housing assistance payment in section 1.1(c) will be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

(c) Maximum Annual Contract Commitment. The maximum annual amount of the commitment for housing assistance payments under this Contract (see section 2.3) is the amount of contract authority identified in Exhibit 3.

(d) Project Description.

The project is located on Crystal Lake Avenue, Haddon Township, Camden County, New Jersey. It is an eight story elevator building; slab on grade foundation; 100 + 1 units; Community Room for congregate dining; passive recreation area; 84,125 square feet; elderly high rise zoning; conventional construction method; wall bearing structural system; precast plank floor system; brick exterior finishing; hot water and vertical fan coil heating system.

EXHIBIT B

(e) Statement of Services, Maintenance and Utilities Provided by the Owner.

(1) Services and Maintenance:

Electric countertop range; electric refrigerator; kitchen exhaust fan; carpet; laundry facilities; trash removal; shades; drapery track; wall ovens; gas / oil heating.

(2) Equipment:

General services and maintenance.

(3) Utilities:

Gas/Oil heating; Hot Water; Gas for cooking; electrical lighting; Water and Oil back-up burners.

(4) Other:

N O N E

(f) Contents of Contract. This Contract consists of Part I, Part II (except as indicated in section 1.4), and the following exhibits:

Exhibit 1: The schedule showing the number of units by size (Contract Units) and their applicable rents (Contract Rents).

Exhibit 2: Daily Debt Service. (If the project is not permanently financed when the Contract is executed, this exhibit should be added when the necessary information becomes available.)

Exhibit 3: The schedule showing contract and budget authority.

Exhibit 4: The Affirmative Fair Housing Marketing Plan, if applicable.

Exhibit 5: An agreement between the parties to incorporate the Final Proposal by reference, specifying the location of the Final Proposal, and identifying each part, including any amendments.

Additional exhibits: [Specify additional exhibits, if any, such as Special Conditions for Acceptance. If none, insert "None."]

N O N E

(6) Scope of Contract. This Contract, including the exhibits, whether attached or incorporated by reference, comprises the entire agreement between the Owner and HUD with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, any applicable regulations, and agreements entered into in writing by the parties which are not inconsistent with this Contract.

1.2 TERM OF CONTRACT; OBLIGATION TO OPERATE PROJECT FOR FULL TERM.

(a) Term of Contract. The term of this Contract for any unit shall be 30 years, beginning with the effective date of this Contract for such unit. [Insert number approved by HUD in accordance with the HUD regulations.] If the project is completed in stages, the term shall be separately related to the units in each stage. However, the total Contract term for all the stages, beginning with the effective date of the Contract for the first stage, shall not exceed the Contract term for any unit, plus two years.

(b) Obligation to Operate Project for Full Term. The Owner agrees to continue operation of the project in accordance with this Contract for the full term specified in paragraph (a).

1.3 HUD ASSURANCE.

The execution of this Contract by HUD is an assurance by HUD to the Owner that:

(a) The faith of the United States is solemnly pledged to the payment of housing assistance payments pursuant to this Contract, and

(b) HUD has obligated funds for these payments.

1.4 APPLICABILITY OF CERTAIN PROVISIONS OF THIS CONTRACT.

| Provision | Applic. | Not Applic. |
|---|---|---|
| (a) 2.4(i). Payments to Trustee by FHA Where It Is the Lender. Applicability: Not applicable. | | X |
| (b) [If the Contract Rents are adjusted under section 2.4 of the Agreement, and either section 2.7(f), (g), or (h) of this Contract has been checked "applicable" at the time of execution of the Agreement, it should be changed to "not applicable" when the Contract is executed.] | | X |
| (1) 2.7(f). Adjustment of Contract Rents Based on Cost Certification. Applicability: All projects unless (1) the project is subject to Part 811: or (2) the Contract Rents do not exceed comparable rents; or (3) the Contract Rents do not exceed comparable rents by more than 10 percent, for Small and Partially-Assisted Projects. | | X |
| (2) 2.7(g). Adjustment of Contract Rents to Reflect Actual Cost of Tax Exempt Financing Not Subject to Part 811. Applicability: All projects where financing is by tax exempt obligations not subject to Part 811 because the issuer is a participating agency under 24 CFR Part 883. | | X |
| (3) 2.7(h). Adjustment of Contract Rents: Part 811. HUD-insured projects subject to Part 811. | | X |

| | | Applic. | Not Applic. |
|---|---|---|---|
| (c) 2.13. | Training, Employment and Contracting Opportunities. Applicability: All projects for which the total initial Contract Rents over the term of the Contract exceed $500,000. | X | |
| (d) 2.14 | Flood Insurance. Applicability: All projects in special flood hazard areas. | | X |
| (e) 2.15. | Clean Air and Federal Water Pollution Control Acts. Applicability: All projects for which the total initial Contract Rents over the term of the Contract exceed $100,000. | X | |

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

OWNER HOUSING AUTHORITY OF THE TOWNSHIP OF HA[illegible]

By* [signature]

Chairman

(Official Title)

Date 4/24, 1981

United States of America
Secretary of Housing and
Urban Development

By* [signature]

Director, Housing Division

(Official Title)

Date 4/28, 1981

* Type name of signatory under signature line.

[If the project is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages of this Contract.]

EXECUTION OF CONTRACT WITH RESPECT TO
CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

Stage 1

This Contract is hereby executed with respect to the units described in Exhibit 1a.

EFFECTIVE DATE: The effective date of this Contract with respect to the units described in Exhibit 1a is ______________________, 19____.

United States of America
Secretary of Housing and
Urban Development

By______________________________

______________________________
(Official Title)

Date______________________, 19____

OWNER______________________________

By______________________________

______________________________
(Official Title)

Date______________________, 19____

EXECUTION OF CONTRACT WITH RESPECT TO
CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

Stage 2

This Contract is hereby executed with respect to the units described in Exhibit 1b.

EFFECTIVE DATE: The effective date of this Contract with respect to the units described in Exhibit 1b is ______________________, 19____.

United States of America
Secretary of Housing and
Urban Development

By______________________________

______________________________
(Official Title)

Date______________________, 19____

OWNER______________________________

By______________________________
(Official Title)

______________________________

Date______________________, 19____

EXECUTION OF CONTRACT WITH RESPECT TO
CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES

Stage 3

This Contract is hereby executed with respect to the units described in Exhibit 1c.

EFFECTIVE DATE: The effective date of this Contract with respect to the units described in Exhibit 1c is ______________________________, 19____.

United States of America
Secretary of Housing and
Urban Development

By______________________________

______________________________
(Official Title)

Date____________________, 19______

OWNER______________________________

By______________________________

______________________________
(Official Title)

Date____________________, 19______

EXHIBIT 1

SCHEDULE OF CONTRACT UNITS AND CONTRACT RENTS [1]

| Number of Bedrooms | Number of Units [2] | Household Type (elderly, non-elderly family, large nonelderly family) | Contract Rent | Utility Allowance |
|---|---|---|---|---|
| One Bedroom | 100 | Elderly | $493 | $18 |

1/ This Exhibit must be completed and attached to the Contract at the time the Agreement is executed. It may, however, be amended in accordance with program rules before the Contract is executed. When Contract Rents are amended (e.g. at the time of an annual adjustment) this format should be used.

2/ If less than 100 percent of units in the project are covered by this Contract, identify specific units to be leased at initial rent-up to eligible families. See section 2.8(c)(6).

EXHIBIT 2

DAILY DEBT SERVICE

| Number of Bedrooms | Number of Units | Daily Debt Service |
|---|---|---|
| 0 | | $ |
| 1 | 100 | $ 13.03 |
| 2 | | $ |
| 3 | | $ |
| 4 | | $ |
| 5 | | $ |

This information is used for computing assistance payments for vacant units under section 2.4(e).

Exhibit 3

This Exhibit shows the initial and subsequent amounts of contract and budget authority obligated for project number: NJ16-0029-003. (The Housing Division shall furnish the Legal Division with the information necessary to complete this Exhibit, with appropriate supporting documentation including an ACC/HAP Contract List.)

| | Contract Authority | Budget Authority |
|---|---|---|
| As of the Effective Date of Agreement | $613,200.00 | $18,396,000.00 |
| Effective Date of Agreement Amendment:______ | | |
| Show Increase or Decrease | | |
| Revised Total | | |
| Effective Date of Agreement Amendment:______ | | |
| Show Increase or Decrease | | |
| Revised Total | | |

| | Contract Authority | Budget Authority |
|---|---|---|
| As of the Effective Date of Contract | | |
| Effective Date of Contract Amendment:______ | | |
| Show Increase or Decrease | | |
| Revised Total | | |
| Effective Date of Contract Amendment:______ | | |
| Show Increase or Decrease | | |
| Revised Total | | |

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM

PART II OF THE

HOUSING ASSISTANCE PAYMENTS CONTRACT

By and between U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (CA) and HOUSING AUTHORITY OF THE TOWNSHIP OF HADDON (Owner).

Check Type of Project: Private-Owner/HUD ____ or PHA-Owner/HUD X
(HUD is the Contract Administrator or "CA.")

or Private-Owner/PHA ____
(The PHA is the CA)

| NEW CONSTRUCTION | or | SUBSTANTIAL REHABILITATION | or | PREVIOUSLY HUD-OWNED |
|---|---|---|---|---|
| Part 880 X | | Part 881 ____ | | Part 886, Subpart C ____ |
| Part 885 ____ | | Part 885 ____ | | |

SECTION 8 PROJECT NUMBER: NJ16-0029-003

FHA PROJECT NUMBER (if applicable): N/A

2.1 OWNER'S WARRANTIES; AMENDMENTS.

(a) Legal Capacity. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

(b) Completion of Work. The Owner warrants that the project as described in section 1.1 is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract (Agreement) or will be completed in accordance with the Special Conditions for Acceptance (see attached exhibit, where applicable). The Owner further warrants that it will remedy any defects or omissions covered by this warranty if called to its attention within 12 months of the effective date of this Contract. The Owner and the CA agree that the continuation of this Contract shall be subject to the Owner meeting any Special Conditions for Acceptance.

2.2 FAMILIES TO BE HOUSED; CONTRACT ADMINISTRATOR (CA) ASSISTANCE.

(a) Families To Be Housed. The Contract Units are to be leased by the Owner to eligible Lower-Income Families (Families) for occupancy by such Families solely as private dwellings and as their principal place of residence. (See also section 2.10.)

(b) CA Assistance.

(1) The CA hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable the Families to lease Decent, Safe, and Sanitary housing pursuant to section 8 of the Act.

(2) If there is a Utility Allowance and if the Allowance exceeds the total Family contribution, the Owner shall pay the Family the amount of the excess. The CA will pay funds to the Owner in trust solely for the purpose of making this payment. Any pledge by the Owner of payments properly payable under this Contract shall not be construed to include payments covered by this paragraph (b)(2). (See 24 CFR section 880.501(e), 881.501(e), or 886.309(a).)

2.3 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT.

(a) Maximum Annual Contract Commitment. Notwithstanding any other provisions of this Contract (other than paragraph (b)(2) of this section) or any provisions of any other contract between the CA and the Owner, the CA shall not be obligated to make and shall not make any housing

assistance payments (or pay any fees where a PHA is a party to this Contract for the purpose of authorizing terminations in the case of previously HUD-owned projects) under this Contract in excess of the amount idençified in section 1.1(c). However, this amount may be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of this Contract.

(b) Project Account.

(1) A project account will be established and maintained by HUD, consistent with its responsibilities under section 8(c)(6) of the Act, as a specifically identified and segregated account for the project. The account will be established and maintained, in an amount determined by HUD, out of the amounts by which the Maximum Annual Contract Commitment under section 1.1(c) (for Private-Owner, HUD or PHA-Owner/HUD Projects) or Maximum ACC Commitment (for Private-Owner/PHA Projects) exceeds the amount actually paid out under the Contract or ACC each fiscal year. Payments will be made from the account for housing assistance payments (and fees for PHA administration) when needed to cover increases in Contract Rents or decreases in tenant rents and for other costs specifically approved by the Secretary.

(2) If funds are available in the project account, the maximum annual contribution payable for any fiscal year will be increased by the amount, if any, as may be required for housing assistance payments (and fees where the CA is a PHA) to cover increases in Contract Rents or decreases in rents payable by Families and other costs approved by HUD.

(3) Whenever a HUD-approved estimate of the required annual contribution for a fiscal year exceeds the maximum annual commitment and would cause the amount in the project account to be less than 40 percent of the maximum annual commitment, HUD will, within a reasonable period of time, take such additional steps authorized by section 8(c)(6) of the U.S. Housing Act of 1937 as may be necessary to assure that payments under the Contract and ACC (if applicable) will be adequate to cover increases in Contract Rents and decreases in rents payable by Families, including (as provided in that section of the Act) "the reservation of annual contributions authority for the purpose of amending housing assistance contracts, or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts."

(4) Any amount remaining in the account after payment of the last annual contribution with respect to the project shall be applied by HUD in accordance with law.

2.4 HOUSING ASSISTANCE PAYMENTS TO OWNERS.

(a) Housing Assistance Payments on Behalf of Families.

(1) Housing assistance payments shall be paid to the Owner for units under lease for occupancy by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of the rent payable by the Family as determined in accordance with the HUD-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by the Family shall be subject to change by reason of changes in Family Income, Family composition, extent of exceptional medical or other unusual expenses or program rules in accordance with the HUD-established schedules and criteria; or by reason of a change in any applicable Utility Allowance approved or required by the CA. Any such change shall be effective as of the date stated in a notification of the change to the Family, which need not be at the end of the Lease term.

(b) Vacancies During Rent-up. If a Contract Unit is not leased as of the effective date of the Contract (or within 15 days of the effective date of this Contract in the case of previously HUD-owned projects), the Owner is entitled to housing assistance payments in the amount of 80 percent of the Contract Rent for the unit for a vacancy period

not exceeding 60 days from the effective date of the Contract, provided that the Owner (1) commenced marketing and otherwise complied with section 2.2(d) of the Agreement, (2) has taken and continues to take all feasible actions to fill the vacancy, including, but not limited to, contacting applicants on its waiting list, if any, requesting the PHA and other appropriate sources to refer eligible applicants, and advertising the availability of the unit in a manner specifically designed to reach eligible families, and (3) has not rejected any eligible applicant, except for good cause acceptable to the CA.

(c) Vacancies after Rent-Up. If an eligible family vacates a unit, the owner is entitled to housing assistance payments in the amount (except as provided in paragraph (d) of this section) of 80 percent of the Contract Rent for the first 60 days of vacancy if the Owner:

(1) Certifies that it did not cause the vacancy by violating the lease, the Contract or any applicable law or by moving a Family to another unit;

(2) Notified the CA of the vacancy or prospective vacancy and the reasons for it immediately upon learning of the vacancy or prospective vacancy;

(3) Has fulfilled and continues to fulfill the requirements specified in paragraphs (b)(1), (2), and (3) of this section; and

(4) Certifies that any eviction resulting in a vacancy was carried out in compliance with section 2.9.

(d) Payments for Vacancies after Initial Occupancy in Previously HUD-Owned Projects. In the case of previously HUD-owned projects, the Owner may receive housing assistance payments for so much of the month in which the Family vacates the unit as the unit remains vacant. Should the unit remain vacant, the Owner may receive from HUD a housing assistance payment in the amount of 80 percent of the Contract Rent for a vacancy period not exceeding an additional month. However, if the Owner collects any of the Family's share of the rent for this period, the payment for the vacancy period must be reduced to an amount which, when added to the Family's payments, does not exceed 80 percent of the Contract Rent. Any such excess shall be reimbursed by the Owner to HUD or as HUD may direct. Paragraphs (c)(1) through (4) apply.

(e) Vacancies for Longer than 60 Days. Except for previously HUD-owned projects not requiring substantial rehabilitation, if an assisted unit continues to be vacant after the period specified in paragraph (b), (c) or (d) of this section, the Owner may apply to receive additional payments for the vacancy period in an amount equal to the principal and interest payments required to amortize that portion of the debt service attributable to the vacant unit (see Exhibit 2) for up to 12 additional months for the unit if:

(1) The unit was in decent, safe and sanitary condition during the vacancy period for which payments are claimed;

(2) The owner has fulfilled and continues to fulfill the requirements specified in paragraph (b), (c) or (d) of this section, as appropriate; and

(c) The owner has demonstrated to the satisfaction of HUD that:

(i) For the period of vacancy, the project is not providing the owner with revenues at least equal to project expenses (exclusive of depreciation), and the amount of payments requested is not more than the portion of the deficiency attributable to the vacant unit, and

(ii) The project can achieve financial soundness within a reasonable time.

(f) Prohibition of Double Compensation for Vacancies. The owner is not entitled to payments for vacant units to the extent it can collect for the vacancy from other sources (such as security deposits, other amounts collected from the Family, payments from the CA under section 2.8(b), and governmental payments under other programs'. If the Owner collects any of the Family's share of the rent for a vacancy period in an amount which, when added to the vacancy payment, results in more than the Contract Rent, the excess must be reimbursed as HUD directs.

(g) CA Not Obligated for Family Rent. The CA has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with section 2.8(b) of this Contract.

The financial obligation of the CA is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

(h) Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the CA or as directed by the CA for housing assistance payments. Each request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of each unit, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit 1 for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with section 2.2(b)(2)); and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by it that to the best of its knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, (iv) none of the amount claimed has been previously claimed or paid under this Contract, and (v) the Owner has not received and will not receive any payments or other consideration from the Family, the PHA, HUD, or any other public or private source for the unit beyond that authorized in this Contract and the lease.

(3) If the Owner has received an excessive payment, the CA (or HUD where the CA is a PHA), in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments are subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(i) Payments to Trustee by PHA Where It Is the Lender. (See section 1.4 for applicability of this paragraph.) The amount of the housing assistance payment determined in accordance with the provisions of this Contract, up to the amount of the mortgage repayments due the PHA from the Owner pursuant to the mortgage loan made by the PHA for the project, shall be credited to the Owner and transferred monthly by the PHA from the account maintained under the General Depositary Agreement pursuant to the ACC to the trustee under the note or bond resolution of the PHA under which the notes or bonds to provide the mortgage loan were issued. Any amount of the housing assistance payment in excess of such credit shall be paid by the PHA directly to the Owner.

2.5 MAINTENANCE, OPERATION AND INSPECTION.

(a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide Decent, Safe, and Sanitary housing including the provision of all the services, maintenance and utilities set forth in section 1.1(e). The Owner also agrees to comply with the lead-based paint regulations at 24 CFR Part 35. If the CA determines that the Owner is not meeting one or more of these obligations, the CA shall have the right to take action under section 2.21(b).

(b) Inspection.

(1) Prior to occupancy of any Contract Unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed or approved by the CA, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the forms. The Owner shall keep copies of these reports on file for at least three years.

(2) The CA shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times (including prior to initial occupancy and rerenting of any unit) as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition including the provision of the agreed-upon utilities and other services. The CA shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

(c) Units Not Decent, Safe, and Sanitary. If the CA notifies the Owner that it has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the CA may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the CA does not have other section 8 funds for such purposes, the CA may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. If the Family continues to occupy the unit, it will do so in accordance with the terms of its lease, including the termination date and amount of rent payable by the Family.

(d) Notification of Abatement. Any reduction or suspension of housing assistance payments shall be effective as provided in written notification to the Owner. The Owner shall promptly notify the Family of any such abatement.

(e) Overcrowded and Underoccupied Units. Where the CA determines a unit is larger or smaller than appropriate for an eligible family, the Owner agrees to correct the situation in accordance with HUD regulations and requirements in effect at the time of the determination.

2.6 FINANCIAL REQUIREMENTS.

(a) Submission of Financial and Operating Statements.

The Owner must submit to the CA:

(1) Within 60 days after the end of each fiscal year of the project, financial statements for the project audited by an Independent Public Accountant in the form required by HUD, and

(2) Other statements as to project operation, financial conditions and occupancy as HUD may require pertinent to administration of the Contract and monitoring of project operations.

(b) Use of Project Funds. (Not applicable to Partially Assisted or Previously HUD-Owned Projects.)

(1) Project funds must be used for the benefit of the project, to make mortgage payments, to pay operating expenses, to make required deposits to the replacement reserve in accordance with paragraph (c) of this section [redacted]

[redacted] To the extent HUD determines that project funds are more than needed for these purposes, the surplus project funds must be deposited with the mortgagee or other HUD-approved depositary in an interest-bearing residual receipts account. Withdrawals from this account will be made only with the approval of HUD and for project purposes, including the reduction of housing assistance payments. Upon termination of the Contract, any excess funds must be remitted to HUD.

(2) In the case of HUD-insured projects, the provisions of this paragraph (b) will apply instead of the otherwise applicable mortgage insurance requirements, except in the case of partially assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance requirements.

(c) Replacement Reserve. (Not applicable to Partially Assisted or Previously HUD-Owned Projects.)

(1) The Owner shall establish and maintain a replacement reserve in an interest-bearing account to aid in funding extraordinary maintenance and repair and replacement of capital items in accordance with applicable regulations.

(i) The obligation of the Owner to deposit into the replacement reserve shall commence upon the effective date of the Contract. For staged projects, the obligation shall commence on a pro rata basis for units in each stage on the effective date of the Contract for that stage. The amount of the deposit to the replacement reserve will be adjusted each year by the amount of the automatic annual adjustment factor. See 24 CFR Part 888.

(ii) The reserve must be built up to and maintained at a level determined by HUD to be sufficient to meet projected requirements. Should the reserve achieve that level, the rate of deposit to the reserve may be reduced with the approval of HUD.

(iii) All earnings including interest on the reserve must be added to the reserve.

(iv) Funds will be held by the mortgagee or trustee for the bondholders, and may be drawn from the reserve and used only in accordance with HUD guidelines and with the approval of, or as directed by, HUD.

(2) In the case of HUD-insured projects, the provisions of this paragraph (c) will apply instead of the otherwise applicable mortgage insurance requirements, except in the case of partially-assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance requirements.

(d) Limitation on Distributions. (Paragraphs (d)(2) - (4) are not applicable to Small, Partially Assisted or Previously HUD-Owned Projects.)

(1) Nonprofit owners are not entitled to distributions of project funds.

(2) For the life of the Contract, project funds may only be distributed to profit-motivated owners at the end of each fiscal year of project operation following the effective date of the Contract after all project expenses have been paid, or funds have been set aside for payment, and all reserve requirements have been met. The first year's distribution may not be made until cost certification, where applicable, is completed. Distributions may not exceed the following maximum returns:

(i) For projects for elderly families, the first year's distribution will be limited to 6 percent on equity. HUD may provide for increases in subsequent years' distributions in accordance with applicable HUD regulations and requirements.

(ii) For projects for nonelderly families, the first year's distribution will be limited to 10 percent on equity. HUD may provide for increases in subsequent years' distributions in accordance with applicable HUD regulations and requirements.

(3) For the purpose of determining the allowable distribution, the Owner's equity investment shall be computed in accordance with HUD regulations and requirements.

(4) Any short-fall in return may be made up from surplus project funds (see paragraph (b)(1)) in future years.

(5) In the case of HUD-insured projects, the provisions of this section will apply instead of the otherwise applicable mortgage insurance program regulations, except in the case of small, partially assisted or previously HUD-owned, insured projects which are subject to the applicable mortgage insurance regulations.

**2.7 RENT ADJUSTMENTS.**

(a) Funding of Adjustments. Housing assistance payments will be made in amounts commensurate with Contract Rent adjustments under this section up to the maximum amount authorized under section 2.3(a) of this Contract.

(b) Annual Adjustments.

(1) Upon request from the Owner to the CA, Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 CFR 888 and this Contract. See, however, paragraph (d).

(2) In the case of previously HUD-owned projects, the Contract Rents shall be adjusted in accordance with 24 CFR 886, Subpart C and this Contract.

(3) Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the annual adjustment result in Contract Rents less than the Contract Rents on the effective date of the Contract.

(c) Special Additional Adjustments. Special additional adjustments shall be granted, when approved by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, assessments, and utilities not covered by regulated rates. The Owner must demonstrate that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by annual adjustments. The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase. See, however, paragraph (d).

(d) Overall Limitation. Notwithstanding any other provision of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD; except to the extent that the differences existed with respect to the Contract Rents set at Contract execution or cost certification, where applicable.

(e) Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit 1 by a dated addendum to the exhibit establishing the effective date of the adjustment.

(f) Adjustment of Contract Rents Based on Cost Certification. (See section 1.4 for applicability of this paragraph.)

(1) Submission by Owner. Within 60 days after HUD accepts the project (or accepts the last stage, where applicable), or any extensions approved by HUD for good cause, the Owner will certify the actual costs estimated in the Final Proposal or Purchase and Use Plan of the replacement cost, operating expenses, income, and debt service, and submit a cost certification including the certificate of an Independent Public Accountant to HUD in the manner and form prescribed by HUD, based on the following guidelines:

(i) Projects which involve HUD mortgage insurance will be subject to the cost certification requirements of the applicable insurance program;

(ii) For projects not insured by HUD, a simplified form of cost certification as prescribed by HUD will be completed and submitted.

(2) HUD Review. Cost certifications will be subject to review by HUD. As part of this review, the Owner and/or contractor may be required to submit additional documentation.

(3) Reduction of Contract Rents. If the Owner's certified costs provided in accordance with paragraph (f)(1) of this section, as approved by HUD, are less than the cost estimates provided in the Final Proposal or Purchase and Use Plan, the Contract Rents will be reduced accordingly.

(4) Reduction of Maximum Annual Commitment. If the Contract Rents are reduced pursuant to paragraph (f)(3) of this section, the maximum annual Contract commitment (and the maximum ACC commitment, in the case of Private-Owner/PHA projects) will be reduced. If Contract Rents are reduced based on certification after Contract execution, any overpayment since the effective date of the Contract will be recovered from the Owner by the CA.

(g) Adjustment of Contract Rents to Reflect Actual Cost of Tax Exempt Obligations Issued by a Participating State Agency Not Subject to Part 811. (See section 1.4 for applicability of this paragraph.) After the project is permanently financed, the financing agency shall submit a certification to HUD specifying the actual financing terms. If the actual debt service to the Owner under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the initial Contract Rents or the Contract Rents then in effect shall be reduced commensurately and the amount of savings credited to the project account. The maximum annual Contract commitment (and the maximum annual ACC commitment, in the case of Private-Owner/PHA projects) will not be reduced.

(h) Adjustment of Contract Rents to Reflect Actual Cost for Projects Subject to Part 811. (See section 1.4 for applicability of this paragraph.)

(1) Submission by Owner and Financing Agency. The Owner and the financing agency shall submit certified statements as to the financing and other costs as required by Part 811 prior to final endorsement. Based on the certified statements, HUD will determine whether any reduction in initial Contract Rents is required under Part 811. Promptly after HUD notification, the Owner and the financing agency agree to amend the Contract to reduce the initial Contract Rents to the extent required by HUD. See sections 2.3(b)(5) and (6) of the Agreement, as appropriate.

(2) Reduction of Maximum Annual Commitment. If the Contract Rents are reduced pursuant to paragraph (h)(1) of this section, the maximum annual Contract commitment (and the maximum ACC commitment, in the case of Private-Owner/PHA projects) will be reduced. If Contract Rents are reduced based on certification after Contract execution, any overpayment since the effective date of the Contract will be recovered from the Owner by the CA.

(i) Adjustment of Contract Rents Due to Property Tax Exemption or Similar Savings. The Contract Rents may be reduced to reflect real property tax exemption or similar savings where the initial Contract Rents were approved on the assumption that the project would not receive the benefit of tax abatement or similar savings. The Owner agrees to notify the CA in the event such a project begins to receive such an exemption or similar savings so that the initial Contract Rents or the Contract Rents then in effect may be reduced.

2.8 MARKETING AND LEASING OF UNITS.

(a) Compliance with Equal Opportunity Requirements. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's HUD-approved Affirmative Fair Housing Marketing Plan (if required), shown as an exhibit, and with all regulations relating to fair housing advertising. Projects shall be managed and operated without regard to race, color, religion, creed, sex, handicap, or national origin and in the case of previously HUD-owned projects in accordance with the tenant selection factors shown as Exhibit 6.

(b) Security Deposits. The Owner agrees to comply with applicable section 8 regulations and other requirements, as revised from time to time, regarding security deposits and to comply with all State and local law.

(c) Eligibility, Selection and Admission of Families.

(1) Except for those families in previously HUD-owned projects determined by HUD at the time of the sale of the project to be eligible for section 8, the Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, computation of the amount of housing assistance payments on behalf of each selected Family and of total Family contributions and recordkeeping in accordance with applicable HUD regulations and requirements.

(2) The Owner shall not charge any applicant or assisted Family any amount in excess of the total Family contribution except as authorized by HUD.

(3) In the initial renting of the Contract Units, the Owner must lease at least 30 percent to Very Low-Income Families (determined in accordance with HUD-established schedules and criteria). However, if this requirement cannot be met for substantial rehabilitation or previously HUD-owned projects because of families already residing in the project, HUD may permit the leasing of less than 30 percent of the units to Very Low-Income Families. Thereafter the Owner shall exercise best efforts to maintain (or achieve and maintain) at least 30 percent occupancy of the Contract Units by Very Low-Income Families. In addition, at all times, the Owner will use its best efforts to achieve leasing to Families with a range of incomes so that the average of incomes of all Families in occupancy is at or above 40 percent of the median income in the area.

(4) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by HUD.

(5) (i) The Owner shall make a reexamination of Family income, composition, and the extent of medical or other unusual expenses incurred by the Family at least as often as required by HUD regulations or other requirements, and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with applicable HUD regulations and requirements.

(ii) If a family reports a change in income or other circumstances that would result in a decrease of total family contribution between regularly scheduled reexaminations, the Owner, upon receipt of verification of the change, must promptly make appropriate adjustments in the total family contribution. The Owner may require in its lease that families report increases in income or other changes between scheduled reexaminations.

(iii) In connection with the reexamination, the Owner shall determine what percentage of Families in occupancy are Very Low-Income Families and what the average Family income is. If there are fewer than 30 percent Very Low-Income Families in occupancy, or the average income is below 40 percent of the median, the Owner shall report the fact to HUD and shall adopt appropriate changes in its admission policies.

(iv) A Family's eligibility for housing assistance payments continues until its total Family contribution equals the total housing expense for the unit it occupies. The termination of

eligibility at this point will not affect the Family's other rights under the lease nor preclude resumption of payments as a result of later changes in income or other circumstances during the term of this Contract.

(6) Where fewer than 100 percent of the units in the project are covered by this Contract, assisted Families shall be dispersed throughout. At initial rent-up, the Owner shall lease the units identified in Exhibit 1 to eligible Families. Thereafter, the Owner may lease other units of appropriate size and type to eligible Families in accordance with Exhibit 1. For projects with units for both elderly and non-elderly Families, the respective family types may be grouped together.

(7) The Owner shall maintain as confidential all information relating to section 8 applicants and assisted Families, the disclosure of which would constitute an unwarranted invasion of personal privacy.

(d) Rent Redetermination after Adjustment in Utility Allowance. In the event that the Owner is notified of a CA determination approving or requiring an adjustment in the Utility Allowance applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

(e) Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable HUD and PHA regulations and requirements and shall maintain records and furnish such copies or other information as may be required by HUD or the PHA.

(f) Review: Incorrect Payments. In making housing assistance payments to Owners, the PHA or HUD will review the Owner's determinations under this section. If as a result of this review, or other reviews, audits or information received by the PHA or HUD at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the PHA or HUD shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise affect recovery.

2.9 TERMINATION OF TENANCY OR SECTION 8 ASSISTANCE BY THE OWNER.

The Owner agrees not to terminate any tenancy of or assistance on behalf of an assisted Family except in accordance with all HUD regulations and other requirements, in effect at the time of the termination, and any State and local law.

2.10 REDUCTION OF NUMBER OF UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

(a) Limitation on Leasing to Ineligible Families. Except in the case of previously HUD-owned projects, the Owner may not at any time during the term of this Contract lease more than 10 percent of the assisted units in the project to families which are ineligible under section 8 requirements at initial occupancy without the prior approval of HUD. Failure on the part of the Owner to comply with this prohibition is a violation of the Contract and grounds for all available legal remedies, including specific performance of the Contract, suspension or debarment from HUD programs and reduction of the number of units under the Contract, as set forth in paragraph (b) of this section. (See also section 2.21.)

(b) Reduction for Failure to Lease to Eligible Families - New and Rehab Projects. If, at any time beginning six months after the effective date of the Contract, the Owner fails for a continuous period of six months to have at least 90 percent of the assisted units leased or available for leasing by families eligible under section 8 requirements at initial occupancy, HUD (or the PHA at the direction of HUD, as appropriate) may, on at least 30 days' notice, reduce the number of units covered by the Contract. HUD or the PHA may reduce the number of units to the number of units actually leased or available for leasing plus 10 percent (rounded up). This reduction, however, will not be made if the failure to lease units to eligible families is permitted in writing by HUD under paragraph (a) of this section.

(c) Reduction --Previously HUD-Owned Projects. If, at any time beginning six months after the effective date of the Contract, the Owner fails for a continuous period of six months to have all of the assisted units leased or available for leasing by families eligible under section 8 requirements at initial occupancy, HUD may, on 30 calendar days' notice, reduce the number of Contract units to not less than the number of Contract units under lease, plus 10 percent of such number if the number is 10 or more, rounded up. Failure by the Owner to make a reasonable effort to lease the units to eligible Families shall be a violation of the Contract and grounds for all legal remedies including those specified in paragraph (a) and section 2.21.

(d) Restoration. HUD will agree to an amendment of the ACC or the Contract, as appropriate, to provide for subsequent restoration of any reduction made pursuant to paragraph (b) or (c) of this section if:

(1) HUD determines that the restoration is justified by demand,

(2) The Owner otherwise has a record of compliance with its obligations under the Contract, and

(3) Contract authority is available. (HUD will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out its agreement.

2.11 NONDISCRIMINATION.

(a) General. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, national origin, or handicap.

(b) Members of Certain Classes. The Owner shall not automatically exclude anyone from participation in, or deny anyone the benefits of, the Housing Assistance Payments Program because of membership in a class, such as unmarried mothers, recipients of public assistance, handicapped persons.

(c) Title VIII of the Civil Rights Act of 1968. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, which prohibits discrimination in the sale, rental, financing and advertising of housing on the basis of race, color, religion, sex, or national origin, and any related rules and regulations.

(d) Title VI of the Civil Rights Act of 1964 and Executive Order 11063. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. et seq.; the HUD Regulations issued thereunder, 24 CFR, Subtitle A, Part 1; the HUD requirements pursuant to these regulations; and Executive Order 11063 and any regulations and requirements issued thereunder, to the end that, in accordance with that Act, Executive Order 11063, and the regulations and requirements of HUD, no person in the United States shall, on the grounds of race, color, creed, or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of HUD, 24 CFR, Subtitle A, Part 1 issued under Title VI of the Civil Rights Act of 1964, HUD regulations issued pursuant to Executive Order 11063 and the HUD requirements pursuant to the regulations. The obligation of the Owner to comply therewith inures to the benefit of the United States of America, HUD, and the PHA (where the CA is a PHA), any of which shall be entitled to invoke any remedies available by law to redress any breach or to compel compliance by the Owner.

(e) Section 504 of the Rehabilitation Act of 1973. The Owner shall comply with all the requirements imposed by section 504 of the Rehabilitation Act of 1973, as amended, and any related rules and regulations. Section 504 provides that no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance. Accordingly, the Owner (1) shall not discriminate against any qualified handicapped person on the basis of handicap and (2) shall

cause to be incorporated into all contracts executed in connection with this project a provision requiring compliance with rules and regulations issued pursuant to section 504.

(f) Employees of Owner.

(1) In carrying out the obligations under this Contract, the Owner will not discriminate against any employee or applicant for employment because of race, color, creed, religion, sex, handicap or national origin. The Owner will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, creed, religion, sex, handicap or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

(2) The Owner agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by HUD setting forth the provisions of this nondiscrimination clause. The Owner will in all solicitations or advertisements for employees placed by or on behalf of the Owner state that all qualified applicants will receive consideration for employment without regard to race, color, creed, religion, sex, handicap or national origin. The Owner will incorporate the foregoing requirements of this paragraph in all of its contracts for project work, except contracts for standard commercial supplies or raw materials, and will require all of its contractors for such work to incorporate such requirements in all subcontracts for project work.

(g) Age Discrimination Act of 1975. The Owner shall comply with any rules and regulations issued or adopted by HUD under the Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits

(c) Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders issued by HUD thereunder prior to execution of this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, its contractors and subcontractors, its successors and assigns. Failure to fulfill these requirements shall subject the Owner, its contractors and subcontractors, its successors, and assigns to the sanctions specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

(d) The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Agreement in excess of $50,000 cost, the following clause.

EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from HUD and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 1701u. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area, and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B The parties to this Contract will comply with the provisions of section 3 and the regulations issued pursuant thereto by HUD as set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D The contractor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontractor is in violation of regulations issued by HUD, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

"E Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of HUD issued thereunder prior to the execution of the Housing Assistance Payments Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, its contractors and subcontractors, its successors, and assigns. Failure to fulfill these requirements shall subject the Owner, its contractors and subcontractors, its successors and assigns to those sanctions specified by the Housing Assistance Payments Contract, and to such sanctions as are specified by 24 CFR, Section 135.135."

(e) The Owner agrees that it will be bound by the above section 3 clause with respect to its own employment practices when it participates in federally assisted work.

2.14 FLOOD INSURANCE. (See section 1.4 for applicability.)

The Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

2.15 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT. (See section 1.4 for applicability of this section.)

In compliance with regulations issued by the Environmental Protection Agency ("EPA"), 40 CFR, Part 15, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 1173.., the Owner agrees:

(a) Not to utilize any facility in the performance of this Contract or a.. nonexempt subcontractor which is listed on the EPA List of Violating Facilities pursuant to section 15.20 of the regulations;

(b) Promptly to notify the CA of the receipt of any communication from the EPA indicating that a facility to be utilized for the Contract is under consideration to be listed on the EPA List of Violating Facilities;

(c) To comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 of the Air Act and section 308 of the Water Act, and all regulations and guidelines issued thereunder; and

(d) To include or cause to be included the provisions of this Contract in every nonexempt subcontract and take such action as HUD may direct as a means of enforcing such provisions.

2.16 REPORTS AND ACCESS TO PREMISES AND RECORDS.

(a) The Owner shall furnish any information and reports pertinent to this Contract as reasonably may be required from time to time by HUD and the PHA (where the CA is a PHA).

(b) The Owner shall permit HUD and the PHA (where the CA is a PHA) or any of their duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.17 DISPUTES.

(a) For Private-Owner/PHA Projects:

(1) Any dispute concerning a question of fact arising under this Contract which cannot be resolved by the PHA and the Owner may be submitted by either party to the HUD Field Office which will promptly make a decision and furnish a written copy to the Owner and the PHA.

(2) The decision of the Field Office will not be reviewable unless, within 30 calendar days from the date of receipt of the Field Office's determination, either party mails or otherwise furnishes to HUD a written appeal with written justification addressed to the Secretary of Housing and Urban Development. Both parties shall proceed diligently with the performance of the Contract and in accordance with the decision of the Field Office pending resolution of the appeal.

(b) For Private-Owner/HUD or PHA-Owner/HUD Projects:

Any dispute concerning a question of fact arising under this Contract which cannot be resolved by agreement between the HUD Field Office and the Owner may be submitted by the Owner to the Secretary of Housing and Urban Development. Both parties shall proceed diligently with the performance of the Contract and in accordance with the decision of the Field Office, pending resolution of the appeal.

2.18 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY, OR OTHER PUBLIC OFFICIALS.

(a) No person or entity in the following classes shall have an interest, direct or indirect, in this Agreement or in any proceeds or benefits arising from it, during his or her tenure or for one year thereafter.

(1) any member or officer of the PHA (where it is the CA or the Owner), except where his or her interest is as tenant;

(2) (i) any employee of the PHA (where it is the CA or the Owner) who formulates policy or influences decisions with respect to the section 8 project;

(ii) any other employee of the PHA (where it is the CA or the Owner), except where his or her interest is as a tenant;

(3) any member of the governing body or the executive officer of the locality (city or county) in which the project is situated;

(4) any member of the governing body or executive officer of the locality (city or county) in which the PHA (where it is the CA or the Owner) was activated;

(5) any other State or local public official (including State legislators), who exercises any functions or responsibilities with respect to the section 8 project;

(6) any PHA (which is not the CA), where any of its members, officers, or employees has a personal interest in the project, including an interest by reason of membership on the board of the PHA which is the CA (except an employee who does not formulate policy or influence decisions with respect to the section 8 project may have an interest as a tenant).

(b) Members of the classes described in paragraph (a) who involuntarily acquire an interest in the section 8 program or in a section 8 project, or who had acquired prior to the beginning of their tenure any such interest, must disclose any interest or prospective interest to the PHA (where it is the CA or the Owner) and the HUD Field Office, and may, with appropriate justification, if consistent with State law,

apply to the HUD Field Office (through the PHA where it is the CA) for a waiver. Any other requests for waivers of paragraph (a) must be referred to the HUD Headquarters, with appropriate recommendations from the Field Office, for a determination of whether a waiver will be granted.

(c) No person to whom a waiver is granted shall be permitted (in his or her capacity as member of a class described in paragraph (a)) to exercise responsibilities or functions with respect to an Agreement or a Contract executed, or to be executed, on his or her behalf, or with respect to an Agreement or a Contract to which this person is a party.

(d) The Owner shall insert in all contracts, subcontracts, and arrangements entered into in connection with the project or any property included or planned to be included in the project, and shall require its contractors and subcontractors to insert in each of the subcontracts, the provisions of paragraphs (a) through (d).

(e) The provisions of paragraphs (a) through (d) of this section shall not apply to a utility service if the rates are fixed or controlled by a governmental agency or applicable to the Depository Agreement.

2.19 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS.

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

1.2. ASSIGNMENT, SALE OR FORECLOSURE.

(a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement, the ACC (if applicable), or the project or any part of them or any of its interest in them, without the prior written consent of HUD (and the PHA where it is the CA). However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD (and the PHA where it is the CA) shall consent in writing if HUD has approved the terms of the financing.

(b) The Owner agrees to notify HUD (and the PHA where it is the CA) promptly of any proposed action covered by paragraph (a) of this section. The Owner further agrees to request the prior written consent of HUD (and the PHA where it is the CA).

(c) (1) For purposes of this section, a sale, assignment, conveyance, or transfer includes but is not limited to one or more of the following:

(i) A transfer by the Owner, in whole or in part,

(ii) A transfer by a party having a substantial interest in the Owner,

(iii) Transfers by more than one party of interests aggregating a substantial interest in the Owner,

(iv) Any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution of interests by any other method or means, and

(v) Any refinancing by the Owner of the project.

(2) An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance, or transfer. An assignment by one or more general or limited partners of a limited partnership interest to a limited partner, who will have no more than a 25 percent interest, shall not be considered an assignment, conveyance, or transfer.

(3) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(d) The Owner and the party signing this Contract on behalf of the Owner represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect to it.

(e) Except where otherwise approved by HUD, this Contract, the Agreement, and the ACC (if applicable) shall continue in effect and housing assistance payments will continue in accordance with the terms of the Contract in the event:

(1) Of assignment, sale, or other disposition of the project or this Contract, the Agreement, or the ACC,

(2) Of foreclosure, including foreclosure by HUD,

(3) Of assignmentof the mortgage or deed in lieu of foreclosure,

(4) The PHA or HUD takes over possession, operation or ownership,

(5) The Owner prepays the mortgage.

[illegible] PHA AND OF OWNER.

(a) [illegible] Owner if PHA Defaults under Contract (for Private-Owner PHA Projects).

(1) Events of Default. The occurrence of any of the following events, if the Owner is not in default, is defined as a default under the ACC:

(i) If the PHA fails to perform or observe any term or condition of this Contract;

(ii) If the Contract is held to be void, voidable, or ultra vires;

(iii) If the power or right of the PHA to enter into the Contract is drawn into question in any legal proceeding; or

(iv) If the PHA asserts or claims that the Contract is not binding upon the PHA for any such reason.

(2) Owner Request for HUD Determination of Default.

If the Owner believes that an event as specified in paragraph (a)(1) has occurred, and the Owner is not in default, the Owner may, within 30 days of the initial occurrence of the event:

(i) Notify HUD of the occurrence of the event;

(ii) Provide supporting evidence of the default and of the fact that the Owner is not in default; and

(iii) Request HUD to determine whether there has been a default.

(3) HUD Determination of Default and Curing of Default.

HUD, after notice to the PHA giving it a reasonable opportunity to take corrective action, or to demonstrate that it is not in default, shall make a determination whether the PHA is in default and whether the Owner is not in default. If HUD determines tha the PHA is in default and that the Owner is not, HUD shall take appropriate action to require the PHA to cure the default. If necessary for the prompt continuation of the project, HUD shall assume the PHA's rights and obligations under the Contract, including any funds. HUD shall continue to pay annual contributions with respect to the units covered by this Contract in accordance with the ACC and this Contract until reassigned to the PHA. All rights and obligations of the PHA assumed by HUD will be returned as constituted at the time of the return:

(i) When HUD is satisfied that all defaults have been cured and that the project will thereafter be administered in accordance with all applicable requirements, or

(ii) When the Contract is at an end, whichever occurs sooner.

(4) Enforcement by Owner. The provisions of this paragraph (a) are made for the benefit of the Owner, the lender, the PHA where it is the lender and then only in its capacity as lender, and the Owner's other assignees, if any, who have been specifically approved by HUD prior to the assignment. These provisions shall be enforceable by these parties against HUD by suit at law or in equity.

(b) Rights of PHA and HUD if Owner Defaults under Contract.

(1) Events of Default.

A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies

identified by the CA in connection with any annual or other inspection; or

(ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; or

(iii) For projects with mortgages insured by HUD or loans made by HUD, the Owner has violated or failed to comply with the regulations for the applicable insurance or loan program, with the regulatory agreement with the insured mortgage, or with the mortgage or loan, or the Owner has filed any false statement or misrepresentation with HUD in connection with the mortgage insurance or loan.

(2) CA Determination of Default.

Upon a determination by the CA that a default has occurred, the CA shall notify the Owner and the lender, with a copy to HUD where the CA is a PHA, of

(i) The nature of the default,

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner and/or the lender to cure the default), and

(iii) The time within which the Owner and/or the lender shall respond with a showing that all the required actions have been taken.

If the Owner and/or lender fail to respond or take action to the satisfaction of the CA (and HUD where the CA is a PHA), the CA shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD (where the CA is a PHA).

(3) Corrective Actions.

Pursuant to paragraph (b)(2) of this section the CA, in its discretion or as directed by HUD (where the CA is a PHA), may take the following corrective actions either directly or in conjunction with or acting through a PHA:

(i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract. If the CA takes possession, housing assistance payments shall continue in accordance with the Contract.

(ii) Collect all rents and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations under the note and mortgage or other loan documents.

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to the PHA and/or HUD arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.