# In the United States Court of Federal Claims

No. 07-646C

(Filed: March 10, 2010)

| | |
|---|---|
| **HADDON  HOUSING ASSOCIATES, LLC,** <br>    **and THE HOUSING AUTHORITY OF THE** <br> **TOWNSHIP OF HADDON, NEW JERSEY,** <br> <br>       **Plaintiffs,** <br> <br> **v.** <br> <br> **UNITED STATES,** <br> <br>       **Defendant.** | Claim for breach of contract for housing assistance payments entered under Section 8 of the Housing Act of 1937, as amended, 42 U.S.C. § 1437f; necessary party; RCFC 19; real party in interest; RCFC 17; permissive joinder; RCFC 20; effect of 1994 amendments to the Act; obligation to request annual rent assistance increases |

Fred J. Livingstone, Taft Stettinius & Hollister LLP, Cleveland, Ohio for plaintiff.  With him on the briefs were Mark J. Valponi and Majeed G. Makhlouf, Taft Stettinius & Hollister LLP, Cleveland, Ohio.

Armando A. Rodriguez-Feo, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Amber Richer, Office of General Counsel, Department of Housing and Urban Development, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This contract case is before the court on plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment.  The case concerns the Rohrer Towers II Apartments, a low-income rental housing project for elderly residents located in Haddon Township, Camden County, New Jersey.  Plaintiff Haddon Housing Associates, Ltd. ("Haddon Associates"), the owner of Rohrer Towers II Apartments, leased the property to plaintiff Housing

Authority of the Township of Haddon, New Jersey ("Housing Authority"), who then entered into a housing assistance payments contract ("HAP Contract") with the United States Department of Housing and Urban Development ("HUD") to provide low-income housing under an amendment enacted in 1974 to the Housing Act of 1937 (also known as the Wagner-Steagall Housing Act). *See* Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 662-66 (1974) (adding Section 8 to the Housing Act of 1937, codified as amended at 42 U.S.C. § 1437f).  Plaintiffs allege that the government contravened the contract in 1994, when Congress further amended the Housing Act to, among other things, change the manner in which adjustments to owners' properties' rents were to be determined.  Plaintiffs contend that the legislative action ripened into a breach of the contract when the government failed to grant rent increases that the contract required.  The government resists the claims of both plaintiffs, Haddon Associates' claim on the ground that it was not a party to the contract, and Housing Authority's claim on a reading of the contract that put the onus of proving entitlement to rent increases on Housing Associates.

This case previously was consolidated with an earlier-filed action, *Pennsauken Senior Towers Urban Renewal Assocs., LLC v. United States*, No. 07-174C (Fed. Cl. filed Mar. 15, 2007), which also concerned a so-called "Section 8" contract with HUD.  In 2008, the government moved for partial dismissal of the consolidated cases on statute-of-limitations grounds.  *See Pennsauken Senior Towers Urban Renewal Assocs., LLC v. United States*, 83 Fed. Cl. 623 (2008).  At issue was the question whether the statutory and regulatory regime under which the contracts were entered allowed rental adjustments to be made solely on the annual anniversary date of the contracts or whether such adjustments could be made at a mid-year point. *Id*. at 626-29.  The court concluded that HUD's procedures allowed rental adjustments to be made at times other than the anniversary date and denied the government's motion to dismiss. *Id*. at 629.  Thereafter, the parties to the *Pennsauken* action reached a settlement, *see* Stipulation for Entry of Judgment, *Pennsauken Senior Towers Urban Renewal Assocs., LLC v. United States*, No. 07-174C (Fed. Cl. filed Dec. 17, 2008), but agreement could not be reached upon a resolution of the instant *Haddon* action.  *Haddon* was severed, and judgment entered in *Pennsauken*.  In *Haddon*, the parties then prepared extensive stipulations of fact and filed the pending cross-motions for summary judgment.  At this juncture, the parties in effect are asking the court for a decision on stipulated facts.

**FACTS[1]**

*A. The Section 8 Housing Program*

The Section 8 housing program, adopted by Congress in 1974, established a new federal program for subsidizing low-income housing.  Pursuant to the new program, HUD entered into

---

[1]The recitations that follow do not constitute findings of fact.  Instead, the recited factual elements are taken from the parties' stipulations of fact and other filings and are undisputed except where a contrary indication is noted.

contracts with private landlords that established an agreed "maximum monthly rent," which would be supplemented by HUD's making "assistance payments" to the landlord.  *See* 42 U.S.C. §§ 1437a(a), 1437f(c)(3) (1976).  The maximum monthly rent was to be based upon "the fair market rental" value of the dwelling unit, allowing for some increase over the market rate to compensate for the expenses attendant to complying with the administrative and regulatory requirements of the Section 8 program.  *See* 42 U.S.C. § 1437f(c)(1).  As originally enacted in 1974, the statute required HUD to adjust the maximum monthly rents on at least an annual basis. *See* 42 U.S.C. § 1437f(c)(2)(A) (1976).  The implementing regulations contained a subsection entitled "Automatic Annual Adjustment of Contract Rents," providing that "[u]pon request from the owner to the contract administrator, contract rents will be adjusted on the anniversary date of the contact in accordance with 24 C.F.R. Part 888."  24 C.F.R. § 880.609(a) (1980).  Adjustments to contract rents were subject to an "overall limitation," such that "[a]djustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary."  42 U.S.C. § 1437f(c)(2)(C) (1976) (which text appears in similar form in the initial sentence of Section 1437f(c)(2)(C) as amended to date).

### B. Rohrer Towers II Apartments Project

On January 1, 1980, Haddon Associates leased the Rohrer Towers II property to Housing Authority for a 30-year term.  *See* Joint Stipulations of Fact ¶ 4 ("Stip."); Stip. Ex. B (Lease Agreement (Jan. 1, 1980)).  The terms of the lease were tailored to the Section 8 program. Among other things, the recitals in the lease state that "the Lessee [Housing Authority] has heretofore entered into an Agreement to Enter Into [a] Housing Assistance Payments Contract ('HAP Agreement') with the United States of America acting through the Department of Housing and Urban Development ('HUD') pursuant to the provisions and requirements of Section 8 of the United States Housing Act of 1937, as amended and supplemented."  Stip. Ex B at 00032 (Lease Agreement).[2]  In Section 7.01 of the lease, "[t]he Lessee [Housing Authority] covenant[ed] to comply with the terms and provisions of the HAP Agreement and the HAP Contract."  *Id.* at 00046.  Section 4.09 of the lease provided that "[o]n or before the tenth day of each month during the term of the HAP Contract and any renewals thereof, the Lessee [Housing Authority] or the Management Agent on the Lessee's behalf shall submit to HUD monthly requests for the payment of Housing Assistance Payments for the next succeeding month with respect to the Project together with a specific direction to HUD that such payments shall be made to the Trustee [appointed under an indenture agreement]."  *Id* at 00041-42.  The Trustee was and has been obligated to credit the deposits "to the Lessor [Haddon Associates] against its obligations under the Note and Mortgage . . . or [the deposits] shall otherwise be expended on behalf of Lessor."  *Id.* at 00042.

---

[2] The documentary attachments to the Joint Stipulations are sequentially paginated, and the pages of the attachments will be cited to that pagination rather than to the document-specific pagination.

Subsequently, effective March 17, 1981, Housing Authority entered into a HAP Contract with HUD for the Rohrer Towers II Apartments, designated HUD project number NJ16-0029-003.  Stip. ¶ 3; Stip. Ex. A (HAP Contract (Mar. 17, 1981)).  Section 2.7(b) of the HAP Contract provided for annual rent adjustments: "Upon request from the Owner to the C[ontract] A[dministrator], Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R. [Part] 888 and this Contract."  Stip. Ex. A at 00016 (HAP Contract § 2.7(b)).  This contractual language tracked the regulatory text of 24 C.F.R. § 880.609(a) (1980) quoted *supra*.  The annual rent adjustment was to be determined "by multiplying the Contract Rent in Effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment Factor" published by HUD for the appropriate geographic region.  24 C.F.R. § 888.203(b) (1980).  However, because Section 8 of the statute prohibited rent adjustments from creating "material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary," 42 U.S.C. § 1437f(c)(2)(C) (1976), the HAP Contract also contained an "Overall Limitation" clause providing that "[n]otwithstanding any other provisions of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD."  Stip. Ex. A at 00016 (HAP Contract § 2.7(d)); *see also* 24 C.F.R. § 880.609(c) (1980) (similar language).

### C. 1989 Amendment to the Housing Act

In the early 1980s, HUD began to conduct "comparability studies" in those markets in which it believed automatic adjustments to assisted units had resulted in materially higher rents than those for comparable unassisted units.  *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 14 (1993).  HUD would select three to five unassisted units it considered comparable to a given assisted unit and use the rents of the former to test whether rents for the latter should be capped.  *Id*.  After landlords successfully contested this action by HUD in a court of appeals, *see Rainier View Assocs. v. United States*, 848 F.2d 988 (9th Cir. 1988), Congress enacted an amendment to the Housing Act explicitly authorizing HUD to use comparability studies prospectively to limit automatic annual adjustment factor increases.  Department of Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, § 801(c), 103 Stat. 1987, 2058 (1989).  The Supreme Court subsequently held that the 1989 amendment did not constitute a breach of the owners' HAP contracts because those contracts authorized HUD to conduct comparability studies and use those studies to limit increases in rent adjustments.  *Cisneros*, 508 U.S. at 21.

### D. 1994 Amendments to the Housing Act

In 1994, Congress further amended the Housing Act to place on owners the obligation to provide comparability studies, thereby in effect requiring owners to shoulder the burden of proving that the adjusted rent for their units would not exceed the rent for comparable unassisted units.  *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (amending 42 U.S.C. § 1437f(c)(2)(A)).  In addition, the 1994 amendments reduced by

one percent the annual adjustment factor for units occupied by a tenant holding over from the previous year.  *See* 42 U.S.C. § 1437f(c)(2)(A).[3]

As part of its effort to implement the 1994 amendments, HUD issued guidance in the form of "Notice 95-12" on March 7, 1995.  *See* Stip. Ex. C at 00060 (HUD Directive 95-12 on the Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995 (Mar. 7, 1995)) ("Notice 95-12").[4]  The Notice provided that to receive a rent increase, an owner had to submit a study of the rent of comparable, unassisted units at least 60 days prior to the HAP contract anniversary date.  *See id*. at 00061-62 (Notice 95-12).  Any adjustment to the contract rent would be limited to the lesser of (1) the "adjusted comparable rent," determined by adding to the comparable rent the initial difference (the amount by which the original contract rent exceeded the original comparable rent), or (2) the rent level adjusted by the appropriate annual adjustment factor.  *Id*. at 00063.  If implementing the new effective rent would require a rent reduction, the current contractual rent level would remain in place.  *Id*.

*E. Rent Calculations for Rohrer Towers and Requests for Rent Increases*

At the time that the HAP Contract for Rohrer Towers II Apartments was executed, the monthly contract rent was $493 for each one-bedroom apartment unit and included an initial difference of $74 between that rent and rent for comparable unassisted units, to compensate for the costs of complying with administrative and regulatory requirements of the program.  Stip. ¶ 8.  By 1995, the contract rent approved by HUD had increased to $860.  Stip. ¶ 12.  After 1995, the contract rent remained at $860 until an adjustment was approved for anniversary year 2007 to bring the contract rent to $889 per unit.  *Id*.  Since 2001, Haddon Associates, on behalf of itself and Housing Authority, regularly submitted to HUD vouchers for payments and received monthly housing assistance payments, payments from tenants, and other revenue from the property.  Stip. ¶ 6.  However, between 2001 and 2006, Haddon Associates did not submit to

---

[3]Both of these 1994 amendments to Section 8(c)(2)(A) stated that "[t]he immediately foregoing sentence shall be effective only during fiscal year 1995."  108 Stat. at 2315.  These amendments were subsequently extended through fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter.  Balanced Budget Act of 1997, Pub. L. No. 105-33, §§ 2003-2004, 111 Stat. 251, 257 (1997); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1998, Pub. L. No. 105-65, § 201(c), 111 Stat. 1344, 1364 (1997); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1997, Pub. L. No. 104-204, § 201(g), 110 Stat. 2874, 2893 (1996).

[4]HUD reinstated and extended the terms of Notice 95-12 through subsequent notices.  *See* Stip. Ex. C at 00082 (HUD Notice 97-14 (Mar. 17, 1997)); *id*. at 00100 (HUD Notice 98-3 (Jan. 23, 1998)); *id*. at 00102 (HUD Notice 99-17 (July 8, 1999)); *id*. at 00103 (HUD Notice 00-14 (Aug. 9, 2000)); *id*. at 00104 (HUD Notice 02-10 (May 17, 2002)).

5

HUD any request for adjustments to the housing assistance payments. Stip. ¶ 13.[5]  On August 13, 2007, Haddon Associates submitted to HUD a request for adjustment to housing payments and attached comparable rent data for the years 2001 through 2007, along with other documentation required pursuant to HUD Notice 95-12.  *Id*.  Haddon Associates submitted similar requests for adjustment to housing assistance payments in 2008 and 2009.  *Id*.

Haddon Associates and Housing Authority filed the complaint on September 4, 2007, Compl. at 1, and thus the period covered by their claim extends back to September 4, 2001.  *See Pennsauken*, 83 Fed. Cl. at 629.

## STANDARDS FOR DECISION

Summary judgment is appropriate if the record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if it "may reasonably be resolved in favor of either party."  *Id*. at 250.  A fact is "material" if it might affect the outcome of the case.  *Id*. at 248.  When deciding these issues, courts view all inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  In disposing of cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party.  *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).  Denial of both motions is warranted if genuine disputes exist over material facts.  *Id*.

## ANALYSIS

### *A. Jurisdiction Over Haddon Associates' Claim*

The government asserts that this court lacks jurisdiction over Haddon Associates' claim because Haddon Associates is not a party to the HAP Contract.  Def.'s Cross-Mot. at 9-10 (citing *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government.")).  Because HUD entered into the HAP Contract only with Housing Authority, the government argues, Haddon Associates lacks privity with the government and should be dismissed as a party.  Def.'s Cross-Mot. at 10; *see, e.g.*, *Cienega Gardens*, 194 F.3d at 1239 (citing *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract.")); *National Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436 (Fed. Cir. 1997) (privity of contract exists only where there is "direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract").

---

[5]The Joint Stipulations do not address whether rent adjustments were sought from 1995 through 2001.

Plaintiffs concede that there is no privity between HUD and Haddon Associates, but they note that privity exists between Housing Authority and HUD and they argue that Haddon Associates is properly joined as a necessary plaintiff under RCFC 19. Pl.'s Opp'n to Def.'s Cross-Mot. at 1. In that connection, plaintiffs contend that Haddon Associates is a real party in interest under RCFC 17. *Id*. at 2-3. Alternatively, Haddon Associates may be an entity that could join the action under RCFC 20 which provides for permissive joinder.

Under Rule 19, a person must be joined as a party if:

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

RCFC 19(a)(1)(B). According to plaintiffs, Haddon Associates must be joined because under the lease it has a direct interest in any breach of the HAP Contract, an interest which it will have difficulty protecting if it is not a party to the action. Pl.'s Opp'n to Def.'s Cross-Mot. at 2; RCFC 19(a)(B)(i). Haddon Associates leased the Rohrer Towers property to the Housing Authority in 1980 for a 30-year term, Stip. ¶ 4, Ex. B (Lease Agreement), which term is nearing its expiration. Under the lease, Haddon Associates covenants to operate and maintain the property in compliance with all of HUD's rules and regulations. Stip. Ex. B at 00040 (Lease Agreement §§ 4.01, 4.02 ). In exchange, the Housing Authority covenants to pay to Haddon Associates a rent equal to all income in connection with the operation of the apartments, "including but not limited to HAP Payments." *Id*. at 00038 (§ 3.03). Plaintiffs consider that failing to join Haddon Associates could subject Housing Authority to "inconsistent obligations," RCFC 19(a)(1)(B)(ii), largely but not entirely because Haddon Associates would be faced with pursuing its financial interests independently, perhaps in tension with Housing Authority, just as the lease is nearing its end. Plaintiffs indicate that this might open Housing Authority to the risk of inconsistent obligations. Pl.'s Opp'n to Def.'s Cross-Mot. at 2-3.

Correlatively, Rule 17 requires the joinder of the real party in interest, RCFC 17(a)(1) ("An action must be prosecuted in the name of the real party in interest."), and RCFC 17(a)(3) requires the joinder or substitution of the real party in interest. RCFC 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."). The Federal Circuit has instructed that Rule 17 is guided by a "general principle that actions should be brought in the name of the real party in interest and that courts should be lenient in permitting ratification, joinder, or substitution of that party." *First*

7

*Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999).
Conceptually,

> [t]he real party in interest is one who has a "real, actual, material or substantial
> interest in the subject matter of the action."  59 Am. Jur. 2d Parties § 36 [1986].
> The general rule that only a party to the contract can enforce the contract has been
> modified by the real party in interest statutes and rules.  59 Am. Jur. 2d Parties
> § 28 [1986].  One of the purposes of this modification is to relax the strict common
> law rules "to enable those who are directly interested but not parties to the contract
> to maintain an action for its breach."

*Edward Kraemer & Sons, Inc. v. City of Kansas*, 874 F. Supp. 332, 335 (D. Kan. 1995); *see also
First Annapolis Bancorp, Inc. v. United States*, 54 Fed. Cl. 529, 542 (2002).  "As with Fed. R.
Civ. P. 17(a), the purpose of RCFC 17(a) is to 'enable a defendant to present defenses he has
against the real party in interest, to protect the defendant against a subsequent action by the party
actually entitled to relief, and to ensure that the judgment will have proper res judicata effect.'"
*System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 170 (2005) (quoting *Virginia Elec. & Power
Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78, 84 (4th Cir. 1973)).

        In tension with these principles, the government argues that as a matter of law, neither
Rule 17 nor Rule 19 "creates an exception to the doctrine of sovereign immunity by allowing
joinder of a party not in privity with the United States, when the subject matter of the dispute is a
breach of contract claim."  Def.'s Reply at 3 (citing *First Hartford*, 194 F.3d at 1289-90 ("In any
event, the presence or absence of an RCFC does not determine the jurisdiction of the Court of
Federal Claims. . . . Rather, the court's jurisdiction is determined by the waiver of sovereign
immunity contained in the Tucker Act."); *see also System Fuels*, 65 Fed. Cl. at 171 ("The
propriety of joinder of a real party in interest under Rule 17(a) does not answer all questions
about whether the court has jurisdiction over a party.").  In short, the government asserts that if
Haddon Associates does not have independent standing to bring a breach-of-contract claim, it
cannot be joined as a party.

        The government reaches too far in its position.  First, the contracting party in this case,
Housing Authority, concededly is a proper plaintiff and has standing to bring its breach-of-
contract claim.  Notably, there is no dispute that the court has jurisdiction over Housing
Authority's contract claim.  The resulting question is purely one of joinder, and the permissive
joinder provisions of Rule 20 also become relevant.  Rule 20 states that "[p]ersons may join in
one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative
with respect to or arising out of the same transaction, occurrence, or series of transactions or
occurrences; and (B) any questions of law or fact common to all plaintiffs will arise in the
action."  RCFC 20(a)(1).

        In *First Hartford*, upon which the government relies, shareholders brought a *Winstar*-
related breach-of-contract suit on behalf of a corporation that was unable or unwilling to bring

suit.  194 F.3d at 1288-89.[6]   The Federal Circuit allowed the shareholders to pursue the breach-of-contract action even though the shareholders themselves were not in privity with the government, relying on the fact that the shareholders were pursuing a derivative suit on behalf of a corporation that was in privity of contract with the government.  *Id*. at 1292-93.  Because of these factual circumstances, *First Hartford* does not directly provide an answer to the question whether Haddon Associates may join Housing Authority in a claim premised on an alleged breach of the HAP Contract between the Housing Authority and HUD, although the analytical approach taken by the court of appeals in *First Hartford* is instructive.  In addressing whether a shareholder derivative suit was proper in this court under the Tucker Act, the court of appeals looked to other situations in which persons or entities who were themselves not direct parties to a contract with, or claim against, the government might sue or be joined in suit against the government.

A close analog here is found in *System Fuels*, in which a service company, System Fuels, contracted with the Department of Energy on behalf of, and as an agent for, Entergy Arkansas, the owner of a nuclear power plant, for disposal of spent nuclear fuel.  65 Fed. Cl. at 165.  System Fuels sued the government for breach of contract and a regulatory taking, *id*., and the government sought to dismiss the takings claim on the grounds that Entergy Arkansas, as the property owner, was the real party in interest on that claim.  *Id*. at 169.  This court agreed that Entergy Arkansas was the real party in interest regarding the takings claim, but rather than dismiss that claim as the government requested, this court permitted System Fuels to amend its complaint to join Entergy Arkansas as a party plaintiff.  *Id*. at 170-71.

Somewhat similar reasoning was applied respecting interrelated entities in the case of *Montana v. United States*, 440 U.S. 147 (1978), where *res judicata* principles were at issue.  In that case, the State of Montana had levied a tax against public, but not private contractors.  *Id*. at 149-50.  A public contractor, who was being directed and financed by the United States, sued Montana to contest the tax and lost on appeal before the Montana Supreme Court.  *Id*. at 151.  The United States had filed its own lawsuit in federal court shortly after the contractor's case was brought, with the case being continued until resolution of the state-court litigation.  *Id*.  After the decision by the Montana Supreme Court, the State contended that the United States, although not a party to the state litigation, was precluded by collateral estoppel from pursuing its case in federal court.  *Id*. at 152-53.  The Supreme Court agreed: "[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party of the record."  *Id*. at 154 (internal quotations omitted) (citations omitted).  In *Montana*, although the public contractor was the plaintiff, the United

---

[6]In *United States v. Winstar Corp.*, 518 U.S. 839 (1996), the Supreme Court upheld a breach-of-contract claim arising from Congress' enactment of legislation which caused federal banking regulatory agencies to override contractual arrangements between federal regulators and financial institutions to apply special accounting treatment to acquisition of failing banks and thrifts by the financial institutions.

States was the real party in interest because the burden of the higher cost would or might be shifted to it on all government contracts in Montana.  *See id.* at 150, 152.  Thus, Rule 17(a), which is designed "to ensure that the judgment will have proper *res judicata* effect," *System Fuels*, 65 Fed. Cl. at 170 (internal quotation omitted) (citations omitted), could have relevance in an action where a non-party finances and directs litigation, because such an interested party will be bound by the outcome of the case.  Rule 17(a) allows for the financing and directing party to be joined in the action.

While the proposition that the "government consents to be sued only by those with whom it has privity of contract" is generally true, *see Erickson Air Crane*, 731 F.2d at 813, exceptions have been recognized.  The Federal Circuit has approved of suits against the government by intended third-party beneficiaries, *see Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997), and by sureties for funds improperly disbursed to prime contractors.  *See Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160-63 (Fed. Cir. 1985).  Also of relevance to this case are suits by subcontractors against the government "by means of . . . pass-through suit[s] when the prime contractor is liable to the subcontractor for the subcontractor's damages."  *First Hartford*, 194 F.3d at 1289 (citing *E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1370-71 (Fed. Cir. 1999)).  "[U]nder ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act . . . to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978."  *Erickson Air Crane*, 731 F.2d at 813 (citations omitted).  Yet the law allows a prime contractor to sue the government on behalf of its subcontractor, by means of a pass-through suit, for costs incurred by the subcontractor for which the prime contractor is liable.  *E.R. Mitchell Constr.*, 175 F.3d at 1370.  The prime contractor will have standing to bring the suit unless the government "prove[s] that the prime contractor is *not* responsible for the costs incurred by the subcontractor that are at issue in the pass-through suit."  *Id.* (citations omitted).  Absent such a showing by the government, "the claims of the subcontractor are treated as if they are the claims of the prime contractor, and any further worry about the absence of subcontractor privity with the government is extinguished."  *Id.* at 1371.  This "allow[s] subcontractors to prosecute claims in the prime's name when [the prime contractors] perceive that the subcontractors really have more at stake in a claim and are therefore willing to work harder on its enforcement."  *Erickson Air Crane*, 731 F.2d at 813.

Nonetheless, factually, whether Haddon Associates is a necessary party, a real party in interest, or a permissive party is not fully ascertainable from the documentary record before the court because some ambiguity exists as to the interrelationship of Haddon Associates with Housing Authority.  The joint stipulations of fact, along with the HAP Contract and lease agreement, provide an indication of the working arrangements between Haddon Associates and Housing Authority insofar as the government is concerned, but relatively few details are available.  For example, there is an indication from the facts that Haddon Associates may have been operating as the managing agent for Housing Authority.  Section 4.09 of the lease requires that either "the Lessee or the Management Agent on the Lessee's behalf" should submit requests to HUD for housing assistance payments.  Stip. Ex. B at 00041 (Lease Agreement § 4.09); *see also id.* at 00039 (§ 3.07) (indicating that the managing agent prepares the annual budget on

behalf of the Lessee).  The parties' joint stipulations do not identify the managing agent but they do state that "[s]ince 2001, Haddon Associates, on behalf of itself and Housing Authority, regularly submitted to HUD vouchers for payments and received monthly housing assistance payments, payments from tenants[,] and other revenue from the property."  Stip. ¶ 6.  In this same vein, the lease provides that "[t]he Lessor [Haddon Associates] will operate the Project so that Lessee [Housing Authority] may comply with all rules and regulations of HUD which are or may become applicable to the Project."  Stip. Ex. B at 00040 (Lease Agreement § 4.01).  Correlatively, under the lease, Haddon Associates is responsible for the maintenance of the Project.  *Id*. (§ 4.02) ("The Lessor [Haddon Associates] will maintain or cause to be maintained each dwelling unit constituting a part of the Project in decent, safe and sanitary condition.").  This constellation of provisions suggests that Haddon Associates not only owns the Project but that it also in effect is responsible for its day-to-day operation, compliance with HUD's regulatory requirements, and for the HUD rental-assistance matters.  However, the record does not disclose the manner in which rental increases were sought from the outset of the Project through 1995, who made decisions not to seek rental increases after 1995 until 2007, or who submitted monthly invoices to HUD for rental-assistance payments.[7]  These and other factual elements may relate directly to whether Haddon Associates is a real party in interest or a necessary or permissive party to the litigation.  In short, a genuine dispute exists as to Haddon Associates' posture in this case and that dispute must be remitted to trial.

### B. Plaintiffs' Obligation to Request Rent Increases

Much of the government's argument in its cross-motion for summary judgment rests on language in the HAP Contract that differs from that used in contracts at issue in prior cases of this type decided by the courts.  Section 2.7(b) of the Rohrer Towers HAP Contract provides: *"Upon request from the Owner to the C[ontract] A[dministrator]*, Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R. 888 and this Contract. . . .  Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the annual adjustment result in Contract Rents less than the Contract Rents on the effective date of the Contract."  Stip. Ex. A at 00016 (HAP Contract § 2.7(b)) (emphasis added); *see also* 24 C.F.R. § 880.609(a) (1980) (similar language).  In contrast, HAP contracts at issue in other cases do not contain an "upon request" clause requiring the owner to make requests for rent adjustments.  For example, in the *Cisneros* litigation, the pertinent HAP contracts stated:

_____

[7]Also, the government must have known of Housing Authority's relationship with Haddon Associates earlier than January 1980, well before the HAP Contract was executed, because recitals in the lease dated January 1, 1980, state that "the Lessee [Housing Authority] has heretofore entered into an Agreement to Enter Into [a] Housing Assistance Payments Contract ("HAP Agreement") with the United States."  Stip. Ex. B at 00032 (Lease Agreement) (quoted more fully *supra*, at 3).

*Automatic Annual Adjustments.*

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. . . .

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government.  Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

*Cisneros*, 508 U.S. at 13; *see also Park Props. Assocs. v. United States*, 82 Fed. Cl. 162, 165 (2008) ("*Park Props. II*"); *Statesman II Apts., Inc. v. United States*, 66 Fed. Cl. 608, 610-11 (2005) ("*Statesman*").  This language had the effect of "making the [rent] adjustments . . . mandatory on the part of HUD."  *Statesman*, 66 Fed. Cl. at 616; *see also Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 759 (2003) ("*Cuyahoga*") ("The 'automatic' references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without [the owner] having to take any significant action.").

In their cross-motions for summary judgment, the parties extensively debate the import of the "[u]pon request from the owner" contractual language of the lease.  The government argues that the HAP Contract in this case, applied in accord with its plain meaning, "place[s] the responsibility of requesting annual adjustments upon the owner as a condition precedent" to receiving rent adjustments.  Def.'s Cross-Mot. at 11-12.  As the government would have it, HUD could not have breached the contract by requiring a comparability study because plaintiffs did not request annual rent adjustments until August 13, 2007.  *See* Stip. ¶ 13.  HUD Notice 95-12, issued to implement the 1994 Amendments, specifies that if an owner fails to request an adjustment before the anniversary date, HUD will only permit the rent adjustment to take place if the owner submits the necessary information and then the adjustment will take place sixty days after the submission.  Stip. Ex. C at 00061-62 (Notice 95-12).

In contrast, plaintiffs contend that the contract at issue here is substantively indistinguishable from the contracts in prior cases and that the regulations governing rent adjustments in effect prior to the 1994 amendments indicate that the rent adjustments were to be automatic.  Pl.'s Opp'n to Def.'s Cross-Mot. at 4-5.[8]  Alternatively, plaintiffs posit that they met

---

[8]The HAP Contract in this case states that the contract rent is to be adjusted "in accordance with 24 C.F.R. 888."  Stip. Ex. A at 00016 (HAP Contract § 2.7(b)).  Section 888 of the regulations referred repeatedly to "Automatic Annual Adjustment Factors."  *See* 24 C.F.R. §§ 888.201, 888.202, 888.203.  Plaintiffs argue that because the contract incorporates the regulations and thus the term "automatic" applied to rent increases, the earlier precedents that

the contract requirements by requesting a rent adjustment on August 13, 2007 for the six years within the statute of limitations. *Id*. at 6. As for Notice 95-12's requirement to submit requests before the anniversary date or within an anniversary year, plaintiffs argue that the Notice has been held to breach the HAP contracts, and therefore its timing requirements should not be given legal force. *Id*. (citing *Cuyahoga*, 57 Fed. Cl. at 762; *Park Props. Assocs. v. United States*, 74 Fed. Cl. 264, 273 (2006) ("*Park Props. I*")).

"In contract interpretation, the plain and unambiguous meaning of a written agreement controls. The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting *Hercules Inc. v United States*, 292 F3d 1378, 1380-81 (Fed Cir 2002)). The inquiry into a contract's interpretation begins "with the language of the written agreement," *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). *See also Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002) ("When the contract language is unambiguous on its face, [the] inquiry ends, and the plain language of the contract controls."). "Generally, [the] court [should] construe[] contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative." *Pacific Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008).

On its face, the HAP Contract appears to require plaintiffs to request rent increases. Nor is such a requirement necessarily inconsistent with the regulations which refer to "Automatic Annual Adjustment Factors." *See* 24 C.F.R. § 880.609(a) (1980) ("Upon request from the owner to the contract administrator, contract rents will be adjusted on the anniversary date of the contract in accordance with 24 C.F.R. Part 888."). A contract could require one party to request a rent adjustment that was then applied according to automatic adjustment factors. Nonetheless, this court lacks sufficient factual evidence to adopt the government's position that plaintiffs' claim is defeated as a matter of law by its failure to request rent increases after 1995 and before 2007.

The stipulated facts indicate that HUD granted plaintiffs rent increases between 1980 and 1994. *See* Stip. ¶¶ 8, 12 (specifying that the contract rent was $493 in 1980 and $860 in 1995). However, nothing in the stipulations or the accompanying documentary exhibits indicates who requested such rent increases or how they were implemented. Indeed, there is no showing whether Housing Authority, or Haddon Associates, or any third party actually requested rent increases from HUD during that time period. In short, there is no evidence regarding whether HUD required formal requests before granting rent increases. This evidence is important to determine whether or not the parties established a pattern of conduct that pragmatically

---

determined rent adjustments were to occur automatically remains applicable, notwithstanding the different contract language. Pl.'s Opp'n to Def.'s Cross-Mot. at 6; *see, e.g.*, *Statesman*, 66 Fed. Cl. at 616 ("In the HAP contracts at issue in the instant case, Section 1.8 plainly manifests the parties' intent that HUD would *automatically* adjust the contract rents on the contracts' anniversary dates . . . .").

interpreted and applied the requirement that plaintiffs request rent increases. *See Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877) ("The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, than to see what they have done."); *City of Chicago v. Sheldon*, 76 U.S. (9 Wall.) 50, 54 (1869) ("In cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence."); *see also Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) (to the same effect); Richard A. Lord, 11 *Williston on Contracts* § 32:14 (4th ed. 1999) (same).

Also lacking is evidence in the stipulations and documentary attachments regarding whether, after the 1994 Amendments, it would have been futile for plaintiffs to request rent increases without submitting comparability studies. In related respect, the factual record is insufficiently developed to determine whether plaintiffs, had they submitted comparability studies, would have waived any claim they might have had that the contract was breached because of the 1994 Amendments. The following hypothetical put forth by Judge Allegra raises these futility and waiver issues:

> Suppose that A agrees to sell Blackacre to B at a date certain, for an amount corresponding to a base price adjusted to the date of the transfer by some recognized inflation index -- that is, *unless* B demonstrates, before the transfer date, that the purchase price so adjusted overstates the market value of Blackacre. Suppose further that, after the agreement is executed, B repudiates the pricing mechanism therein and instead indicates that it will pay only the unadjusted base price, *unless* A demonstrates that the inflation-adjusted figure corresponds to the actual market value of Blackacre. Despite the fact that the parties cannot agree on the price, the transfer occurs. A refuses to comply with B's new pricing mechanism, fearful, *inter alia*, that doing so might be viewed as waiving any breach claim it might have. Yet, A, nonetheless, insists that B owes it the higher purchase price established by the original contract, independent of the limitations clause, which, of course, was never invoked by B. B, for its part, asserts, that it owes only the unadjusted base price because A failed to demonstrate that it was entitled to the inflation-adjusted price. B makes its payment on this basis. A sues B.

*Park Props. II*, 82 Fed. Cl. at 168. In analyzing this hypothetical, Judge Allegra suggested that one must

> ask first whether the condition originally imposed on the inflation-adjusted price survived the repudiation[.] If it did not, then B would be obliged to pay the inflation-adjusted price whether the clause was invoked or should have been, and no matter what the market value of the property was at the time of the transfer. This result has the advantage, of course, of preventing B from benefit[t]ing from

14

its own repudiation -- in seeking to limit its exposure, it can rely neither on the assumption that it would have invoked the original limitations clause, nor A's failure to invoke the new limitations clause unilaterally imposed by B, nor even subsequent proof at trial that, had the limitations clause been invoked, the market value of Blackacre would have been lower than the inflation-adjusted price.

*Id*. at 169.  While this particular hypothetical was examined in determining the applicability of the overall limitation clause, *see id*., it is also relevant in determining whether the "upon request" clause in this HAP Contract survived the changes introduced by the 1994 amendments, which allegedly breached the HAP Contract, or whether the futility of making such a request after the 1994 amendments should lead the court to deem the clause to be without effect.

Because the particular circumstances of this case raise issues of contemporaneous construction by the parties as to the "upon request" clause, as well as of waiver and futility, and because the factual record is insufficient to decide the cross-motions for summary judgment, they must be denied and the case remitted for trial.

## CONCLUSION

For the reasons stated, the extensive stipulations of fact filed by the parties are insufficient to resolve issues material to a disposition of this case.  Accordingly, plaintiffs' motion for summary judgment and the government's cross-motion for summary judgment are DENIED.  The parties are requested to file a joint status report on or before April 2, 2010, addressing the matters encompassed by RCFC Appendix A, ¶¶ 5 and 12 (last sentence), with respect to preparations for a trial of the material issues in dispute.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge